**David Christopher GRAHAM,
Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 2–98–483–CR.

Court of Appeals of Texas,
Fort Worth.

Oct. 21, 1999.

Brian W. Wice, Houston, for Appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Asst. Dist. Atty., and Chief of the Appellate Section, Sylvia Mandel, Michael Parrish, Michele Hartmann, Asst. Dist. Atty., Fort Worth, for Appellee.

Panel B: DAY, BRIGHAM, and HOLMAN, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

A jury found Appellant David Christopher Graham guilty of the December 4, 1995 capital murder of a fifteen-year-old high school student, Adrianne Jones, by shooting her in the head twice with a handgun. The State had not sought the death penalty, and the trial judge sentenced Appellant to life in prison. Appellant does not challenge the sufficiency of the evidence, but with fifteen points of appeal presents procedural and constitutional issues about his trial. Appellant asserts that the trial court erroneously allowed the jury to consider inadmissible

hearsay, violating Rule 803(24) of the Texas Rules of Evidence and infringing his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and article 1, section 10 of the Texas Constitution, when witnesses Kristina Mason and Jennifer McKearny repeated for the jury oral statements in which their friend, Diane Zamora, told them how she and Appellant had kidnaped Jones and murdered her. Eventually Appellant, a cadet at the United States Air Force Academy in Colorado Springs, Colorado, and his fiancee, Zamora, a cadet at the United States Naval Academy in Annapolis, Maryland, were charged with the crime. Zamora was tried and convicted of capital murder before Appellant's trial began. *See generally Zamora v. State*, 998 S.W.2d 290 (Tex.App.—Fort Worth 1999, pet. filed). Because we find no reversible error, we affirm the trial court's judgment.

## BACKGROUND

Zamora and Mason were longtime friends. Appellant's brief describes how Mason and McKearny related to the jury what Zamora had said:

Kristina Mason testified that Zamora told her, "That's how [Appellant] proved his love for me. He killed [Jones]." Zamora told Mason that Appellant killed Jones because she had slept with him and that there was a plan to get Jones out of her house. Appellant drove and Zamora hid in the trunk of her Mazda while they drove Jones to Joe Pool Lake. Zamora told Mason that there had been a struggle at Joe Pool Lake between [Jones], Zamora, and Appellant and that Zamora tried to hit Jones with a weight. Zamora told Mason that Jones escaped and ran to a nearby field and collapsed. Zamora then told Appellant, "Shoot her, kill her, shoot her." Mason admitted that when she first appeared before the grand jury, she did not tell the truth until [the State] threatened to charge her with aggravated perjury.

Jennifer McKearny [Zamora's roommate at the United States Naval Academy] testified that Zamora told her that she and her boyfriend had killed a girl while they were in high school and that the killing had been planned. Zamora told McKearny that the victim had slept with Appellant and that in order 'to make up for what had happened,' Appellant had to kill the victim.

McKearny admitted that Zamora had told her that she was driving the Mazda and that Appellant was in the front seat. She also admitted that Zamora had told her that the shot that Appellant fired at Jones was not a fatal shot, that Appellant was "freaking out," that Zamora drug (sic) Jones' body out of the car into the field, and that when they left, Jones was not yet dead. Zamora never told McKearny that she had hid in the trunk of the Mazda and had surprised Jones. [Record references omitted.]

McKearny reported Zamora's statement to officers at the United States Naval Academy, and they notified members of the police department in Grand Prairie, Texas who began a police investigation that included sending police detectives to the United States Air Force Academy to interview Appellant.

## CONFRONTATION

■ The first issue of Appellant's appeal is whether allowing the jury to hear Mason testify about Zamora's oral statements to her violated his right to confront witnesses against him afforded by the federal constitution. *See* U.S. CONST. amends. VI and XIV. The second issue is whether Mason's testimony violated Appellant's right of confrontation under the state constitution. *See* TEX. CONST. art. I, § 19. The third issue is whether Mason's testimony was inadmissible hearsay that violated the rules of evidence. *See* TEX.R. EVID. 803(24). Appellant's fourth, fifth, and sixth issues present the same challenges to McKearny's testimony about Zamora's oral statements to her. Nevertheless, the

State accurately contends, and Appellant conceded at oral argument, that Appellant has waived his state constitutional challenges (the second and fifth issues). We accept as correct the following assertions from the State's brief:

> Appellant completely fails to argue points two and five relating to alleged State Constitutional violations. Error premised on the Texas Constitution requires argument and authority to support the proposition that it provides greater protection than the Federal Constitution. *Heitman v. State,* 815 S.W.2d 681, 691, n. 23 (Tex.Crim.App. 1991). Recently, the court has further held that the failure to provide the court with any distinction or reason for greater protection under the State Constitution makes review of such points unnecessary. *[Lagrone] v. State,* 942 S.W.2d 602, 612 (Tex.Crim.App.1997), *cert. denied,*— U.S. ——, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997). *See also Jones v. State,* 950 S.W.2d 386, 389 n. 1 (Tex. App.—Fort Worth 1997, pet. ref'd.) (Absent proper briefing, state and federal claims are reviewable under Federal standards alone). At no time has Appellant made any argument for greater protection under the State Constitution. Points two and five should, therefore, be overruled.

Because we agree, we overrule Appellant's second and fifth issues that rely upon the right to confront witnesses granted by article I, section 19 of the Texas Constitution.

■ A declarant's hearsay statement that inculpates the declarant in a crime and also implicates another person in the same crime may be admissible against the other if the declarant's statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. *See Williamson v. United States,* 512 U.S. 594, 603, 114 S.Ct. 2431, 2436–37, 129 L.Ed.2d 476 (1994). Whether a statement is self-inculpatory or not can only be determined by viewing it in context. *See id.* at 603, 114 S.Ct. at 2436. Here, the State argues persuasively that the trial court did not abuse its discretion by admitting Zamora's oral declarations into evidence because the circumstances surrounding her oral declarations to Mason and McKearny were clearly self-inculpatory, showed sufficient indicia of reliability, were corroborated by other independent testimony, and, in the instance of McKearny's testimony, was admitted without objection from Appellant.

Zamora made the declarations to Mason and McKearny at a time when Zamora and Appellant were neither charged with nor even suspected of the murder. Because Zamora's declarations to both Mason and McKearny were admissions that she helped plan and carry out a kidnaping and murder, the declarations implicated her in crimes and were self-inculpatory. Considering the context in which Zamora made those declarations, we cannot ignore the fact that although she was not yet suspected of or charged with the crimes of kidnaping and murdering Jones, she confided those declarations not to law enforcement authorities but rather to her friends Mason and McKearny, sharing with them secrets about her crimes, while boasting of both the criminal acts she and Appellant had committed and also the extent of the personal devotion and bonding that she believed existed between her and Appellant. By the time Zamora's oral declarations were offered as evidence at Appellant's trial, Zamora's circumstances had changed. By then, she had already been charged, tried, and convicted for the capital murder of Jones. Zamora's earlier declarations to Mason and McKearny are trustworthy evidence that was reliable and admissible because the content of the declarations tended to subject Zamora to criminal liability. A reasonable person in her position at the time she made the statements would not have done so unless believing them to be true. *See* Tex.R. Evid. 803(24). In other words, Zamora's

declarations to Mason and McKearny contain inherent guarantees of trustworthiness because the declarations clearly were made in a "setting [that] suggests no motive to speak falsely." *United States v. Flores,* 985 F.2d 770, 780 (5ᵗʰ Cir.1993).

■ Moreover, although the trial court granted Appellant a running objection to Mason's testimony, Appellant had no running objection to McKearny's testimony, nor did Appellant object during McKearny's testimony. The trial court's pretrial ruling on Appellant's motion in limine about McKearny's anticipated testimony about Zamora's oral declarations did not preserve error or make an objection to McKearny's testimony during the trial unnecessary. *See McDuff v. State,* 939 S.W.2d 607, 618 (Tex.Crim.App.), *cert. denied,* — U.S. —, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997); *Ethington v. State,* 819 S.W.2d 854, 858 (Tex.Crim.App.1991). Thus, Appellant has waived any error in admitting McKearny's testimony.

The two women related to the jury substantially the same description of Zamora's oral declarations to them, although arguably McKearny's unobjected-to description was more detailed than Mason's. We overrule Appellant's first, third, fourth, and sixth issues.

### APPELLANT'S ORAL AND WRITTEN STATEMENTS

Issues seven through twelve attack the trial court's denial of Appellant's motions to suppress evidence against him. Before the trial, the court held a hearing on the motions to suppress, then filed findings of fact and conclusions of law, which are before us. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22 § 6 (Vernon 1979); *Jackson v. Denno,* 378 U.S. 368, 390, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908 (1964). Appellant argued then and now argues on appeal that his written statement admitting that he shot Adrianne twice with a Makarov 9mm was involuntary and a product of custodial interrogation and of a warrantless arrest without probable cause that

violated the Fourth Amendment to the United States Constitution and article 14.04 of the Code of Criminal Procedure. His seventh issue is whether the trial court erred by admitting the statement into evidence despite prohibitions of the federal constitution. His eighth issue is whether the trial court erred by admitting the statement into evidence in violation of the provisions of chapter 14. His ninth issue is whether the trial court erred by admitting his statement into evidence in violation of article 38.22 of the Texas Code of Criminal Procedure. Both his tenth and eleventh issues contend that the statement's admission into evidence violated article 38.23 of the Texas Code of Criminal Procedure. Appellant's twelfth issue asserts that the admission into evidence of his oral statement that directed a police detective to the hiding place of the handgun with which Jones was shot violated article 38.22, section 3(a) of the Code of Criminal Procedure.

■ Because reasonable persons may disagree whether in common experience a particular inference may be drawn from a specific piece of evidence, an appellate court will not intercede and reverse as an abuse of discretion a trial court's decision on whether to exclude that evidence as long as the trial court's ruling was within the zone of reasonable disagreement. *See Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim. App.1997) (appellate courts should show almost total deference to a trial court's findings of fact especially when those findings are based on an evaluation of credibility and demeanor); *Hunter v. State,* 955 S.W.2d 102, 105 n. 4 (Tex.Crim.App.1997).

■ Here, the evidence presented to the trial court at the pretrial hearing of Appellant's motions to suppress supports these findings of fact and conclusions of law made by the trial court:

1. [Appellant] attended high school with the deceased, Adrianne Jones,

in Mansfield, Texas. In the spring of 1996, [Appellant] was awarded an appointment to the prestigious United States Air Force Academy in Colorado Springs, Colorado.

2. [Appellant] was a Cadet 4th Class in September, 1996. As a Cadet 4th Class [Appellant] enjoyed very little freedom of movement.

3. The interrogation of [Appellant] occurred on 2 federal military installations or reservations while [Appellant] was on active duty as a member of the United States Air Force.

4. On September 3, 1996, Detectives Meyer and Jackson of the Grand Prairie Police Department traveled to Colorado Springs to the Air Force Academy to interview [Appellant] concerning the murder of Adrianne Jones.

5. Upon arrival the two Detectives met with Office of Special Investigations Agents Stalvey and Bowman . . . to discuss the Jones investigation.

6. Special Agent Stalvey changed locations to [Appellant's] dormitory area. [Appellant's] squadron leader brought [him] to Stalvey's location. Stalvey told [Appellant] to relax. Stalvey told [Appellant] that there were a couple of folks in his office that wanted to talk to him about something and would he be willing to go over to the OSI office. [Appellant] agreed. If [Appellant] had refused, he would not have been forced to go to OSI.

7. Upon arrival at OSI, [Appellant] was introduced to and left with Detectives Jackson and Meyer. Prior to the commencement of the interview Meyer read the *Miranda* warnings to [Appellant who] waived his rights and agreed to talk to the detectives. He did not request an attorney. [Appellant] visited with the detectives for approximately 1 ½ hours, during which he denied any involve-

ment and agreed to take a polygraph. The interview with Grand Prairie was then concluded.

8. [Appellant] next met with the OSI officers. In accordance with the Uniform Code of Military Justice, hereinafter UCMJ, [Appellant], after being properly warned voluntarily signed a consent to search his room. The search was completed and various items of correspondence between Zamora and [Appellant] were seized.

9. Arrangements were made with OSI Agent Kyle to take [Appellant] to Denver the following day for the polygraph examination. Agent Stalvey testified that the 'standard rule' required that a 24 hour time period elapse between the last interview and the polygraph examination on the same subject. Therefore, [Appellant] was taken to the command post where he could spend the night prior to the examination.

10. The command center is manned 24 hours a day and General Stein ordered [Appellant] be kept there overnight prior to the polygraph examination. [Appellant] was left with Captain K[l]odniki. If [Appellant] attempted to leave the officer was to take only verbal action, not physical. As a member of the United States Air Force [Appellant] was not permitted to leave the base at any time that he wished and, specifically, as a first year Cadet 4th Class, [Appellant] was restricted to base most of the time. Other tha[n] being required to spend the night at the command post, [Appellant] was not otherwise restricted. He could sleep an[d] watch TV. He was fed both dinner and breakfast. He slept in Captain Klodniki's bunk.

11. Graham was not interrogated by anyone regarding the Jones murder from the time the interview

with the Grand Prairie detectives ended in the afternoon of September 3, 1996 until the polygraph began in the late afternoon hours of September 4, 1996.

12. Prior to leaving for Denver Agent Stalvey again asked [Appellant] if he was still willing to take a polygraph exam and [Appellant] said yes. It was [Appellant's] choice to take the polygraph. During the ride to Denver, Agents Stalvey and Bowman did not discuss the case with [Appellant]. Nor did [Appellant] indicate in any way that he had been mistreated by Detectives Jackson and Meyer. [Appellant] appeared relaxed. On the way to Denver the agents and [Appellant] stopped at a McDonald's drive through for lunch and [Appellant] was fed.

13. At no time was [Appellant] handcuffed prior to, or on the way to, the polygraph exam. Weapons were never displayed in a threatening manner.

14. Once the military investigators became involved [Appellant] made clear it was his desire to deal with the civilian officers *only through the OSI agents*. It was [Appellant's] choice to have the military conduct the investigation.

15. Upon arrival at the OSI office at Buckley Air Force Base in Denver, at approximately 1:30 pm on the 4th, the agents went upstairs to speak with Agent Kyle and [Appellant] was left alone, unguarded and without any physical restraints; no handcuffs or leg irons. [Appellant] was left in the lobby for about 20 minutes.

16. [Appellant] was taken upstairs and introduced to Agent Kyle. At that time, prior to any questioning, [Appellant] was advised of his rights in accordance with Article 31 of the UCMJ, and he agreed to take the polygraph examination.

17. The warnings given by Agent Kyle to [Appellant] advise[d] him that he is a suspect in the murder of Adrianne Jones and track[ed] civilian *Miranda* and article 38.22 warnings. The warnings are attached hereto as exhibit A.

18. [Appellant] orally and in writing waived his rights and voluntarily agreed to the polygraph examination.

19. Prior to [Appellant's] arrival, the Grand Prairie detectives had briefed Agent Kyle regarding the offense. Once [Appellant] arrived Agent Kyle took over the investigation.

20. Agent Kyle, prior to the testing, showed [Appellant] around the facility. The pre-test interview then commenced.

21. Six tests were run, including the preparation test. At 7:30 pm a break was taken for dinner.

22. During dinner, [Appellant] was not questioned by anyone regarding the offense. All parties, the three OSI officers, the two Grand Prairie officers and [Appellant] ate together and the conversation was small talk.

23. At approximately 8pm Kyle and [Appellant] returned to the polygraph area. Kyle again asked [Appellant] if he wanted a lawyer and [Appellant] declined.

24. During the post test interview Kyle explained to [Appellant] that he had done poorly in several areas. Kyle also informed [Appellant] that the police had interviewed [Appellant's friend, John Green] and [that Green] was cooperating with police and was going to give a statement.

25. At this point, around 9:00 p.m., [Appellant] requested to move to a more private area [and] did not

want any of the other officers to be able to see or hear what he was going to say. Officer Kyle complied and he and [Appellant] moved to an inter(sic)-office.

26. [Appellant] then told Kyle that he already knew what had happened and Kyle told [Appellant] he couldn't assume anything. Kyle then asked specific question[s] regarding the murder and [Appellant] answered. [Appellant] admitted to shooting Jones twice on the face and head. He admitted to luring Jones out of her home, accompanied by Zamora and in her mom's car.

27. [Appellant] would not tell Kyle what [Appellant and Zamora] hit Jones with; instead, he wanted the officers to guess. For the next two or three hours, Kyle would run in and out of the polygraph room with guesses and responses.

28. At approximately 9:20 p.m., [Appellant] asked if he wanted a lawyer, could he have a specific lawyer that he knew. Kyle asked whether [Appellant] wanted a lawyer and [Appellant] again said no. At approximately 10 p.m. Kyle took a break and updated the other officers.

29. Grand Prairie detectives started the process of obtaining arrest warrants for both [Appellant] and Zamora. [Appellant] continued his guessing game with the police.

30. [Appellant] was informed after his admissions that he would not be going home but would be transported to the military brig. [Appellant] acknowledged that he understood and asked to stay until Zamora was arrested. [Appellant] was given any breaks for the bathroom that he wanted. He was given drinks and he was also allowed to call [K]ristina Mason.

31. Throughout the evening Kyle repeatedly inquired of [Appellant] if he wanted counsel and the inquiry was always answered in the negative. [Appellant] never indicated he no longer wanted to talk to the police, nor did he make any requests other than wanting to speak to Zamora to tell her not to do something stupid and to cooperate. This request was denied because of concerns for officer safety if Zamora was pre-warned that the police were coming to arrest her.

32. After the oral admissions the officers sought to obtain a written statement. [Appellant] refused numerous requests saying he was not ready yet. Agent Stalvey, Bowman and Kyle testified that [Appellant] did not want to give a statement until he knew that Zamora had been arrested and was safe.

33. At approximately 11:30 pm Officer Meyers and Agent Kyle engaged in a prearranged confrontation in the hopes of getting appellant to provide a written statement or end the interview and game playing. The officers had tired of the guessing game and wanted to go home or get a written statement. Officer Meyer entered the interview room and in a loud manner told [Appellant] the guessing game was over. Meyer told [Appellant] that he had enough evidence and that he could and would file capital murder charges and that [Appellant] could be facing the death penalty. Meyer further told [Appellant] he could cooperate and give a statement or not; he really didn't care. Meyer was obtaining a warrant from Texas and when it arrived he was going to take [Appellant] into custody and take him to jail. Agent Kyle stepped in and told Meyer that was not going to happen that [Appellant] was in his custody on a Federal reservation and Meyer could not

take [Appellant]. Meyer left the room.

34. At Kyle's suggestion [Appellant] asked to speak to Meyers regarding a deal not to seek the death penalty. Meyers returned and explained the entire ranges of punishment from probation to a life sentence or the death penalty. [Appellant] was told that Meyer could not make any promises. Kyle suggested that [Appellant] get an agreement in writing from Meyers and Meyers said no. No agreement, no writing, and no promises or coercion.

35. After Meyers left the room Kyle continued to speak to [Appellant] and explained that he could be prosecuted and the statements he'd already made could be used and that if he gave a written statement he could explain why he did what he did.

36. At approximately 12:20 a.m on September 5, 1996, the arrest warrant for [Appellant] arrived from Texas and was shown to [Appellant who] was also informed that Diane Zamora had been arrested without incident.

37. Shortly thereafter [Appellant] told the OSI agents that he would provide a written statement. He asked to type the statement himself and he was instructed on how to use the word processor.

38. [Appellant] was again informed that he did not have to make a statement if he did not want to and the decision was his alone to make. [Appellant] chose to make a written statement.

39. From approximately 1 a.m. to 2:30 a.m. [Appellant] was left alone to type his statement. He was told to include the facts he had already verbally admitted to doing and anything else he wanted to include.

40. After he concluded his statement he and Agent Stalvey reviewed it. Stalvey noted that [Appellant] had omitted any mention of where they had hid the clothes and inquired if [Appellant] wanted to include that fact. [Appellant] chose to do so and it was added by [Appellant] himself. The statement was then again reviewed.

41. [Appellant] was advised of his rights again, this time by Agent Stalvey, and he again voluntarily and knowingly waived his rights.

42. Prior to signing the statement, Agent Stalvey placed [Appellant] under oath. [Appellant] then swore that the attached statement was true and that he had not been coerced or promised anything in exchange for the statement.

**Oral Admissions to Meyer**

1. The written statement did not contain any admissions regarding the location of the weapon that [Appellant] used to kill Jones.

2. After the signing of the written statement Agents Stalvey and Bowman asked Meyers and Jackson to transport [Appellant] back to the academy. The Grand Prairie detectives and [Appellant] drove to the Air Force Academy in one vehicle with Meyers driving, [Appellant] in the front passenger seat and Jackson alone in the back seat.

3. During the hour or so trip back, no interrogation took place. Meyer and [Appellant] exchanged pleasantries and 'small talk.' [Appellant] voluntarily and without any promises or coercion engaged in this small talk.

4. During this conversation [Appellant] told Meyer that he had a 'point of honor' to clear up. He then volunteered to tell the police where the murder weapon was located. He told Meyers that the Makarov 9mm was hidden in the attic of his father's

home. When he started explaining exactly where Meyers called Deputy Chief Geary on the car phone and advised him that [Appellant] was wanting to direct the officers to the location in the attic where the weapon could be found.

5. [Appellant] voluntarily took the phone and spoke with GEARY and told him where to find the murder weapon. Geary drafted a search warrant and included [Appellant's] volunteered information.

6. A probable cause search warrant was issued for [Appellant's] father's residence in Mansfield based, at least in part, on [Appellant's] oral statements regarding the location of the murder weapon.

7. A 9mm Makarov was seized during the search of the residence in Mansfield and subsequent testing proved that it was the weapon that fired the two fatal gunshots to Adrianne Jones' head.

8. [Appellant] did not testify.... No evidence was presented to this court regarding the ownership of the residence in Mansfield where the murder weapon was recovered. The evidence supports the inference that [Appellants'] father was residing at the residence at the time of the search. However, [Appellant] was not living in the home at the time of the search. There was no evidence presented from either side concerning [Appellant's] expectation of privacy, if any, in the contents of his father's home. Specifically, no evidence was presented regarding any expectation of privacy on [Appellant's] part regarding the contents of the attic of a home in which he no longer resided.

CONCLUSIONS OF LAW

APPLICABLE LAW:

1. The investigation of [Appellant's] involvement in a homicide committed before he was enlisted in the Air Force was properly conducted. Because [Appellant] was an active member of the United States Air Force and because he was located on a Federal Military Reservation during the interrogations and the making of the written statement, the assistance of the Air Force investigators was required. *See generally, Allison v. United States*, 426 F.2d 1324, 1326 ( [6th Cir.]1970) (Cadets or midshipmen at the service academies are subject to the Military Code). Military authorities are authorized to offer assistance to civilian authorities in the investigation of criminal offenses. 10 U.S.C.A. § 802 article 2(a)(2); *see also United States v. Yunis*, 924 F.2d 1086, 1092–1094 (C.A.D.C.1991) (Military may offer passive or indirect assistance to civilian authorities[) ]. Permitting the Texas authorities to interview [Appellant] at the Air Force Academy was proper.

2. When [Appellant] voluntarily agreed to a polygraph exam the military investigators were required to become involved. Once this occurred, [Appellant] was properly advised of his rights under both *Miranda* and the Military Code of Justice. This is evidenced by the signed waivers executed by [Appellant].

3. Because [Appellant] chose the military to conduct the investigation he cannot complain as to any discrepancies regarding military law and Texas state law. Having chosen the military to conduct the interview he is estopped from asserting that Texas law grants him greater protection.

4. Apprehension and custody are essentially the same. Under the Uniform Code of Military Justice there is no requirement of a written order of apprehension, or, in civilian parlance, an arrest warrant. All that is

required is that an authorized individual have 'reasonable belief' (in civilian parlance 'probable cause') to believe that an offense has been committed and that the person apprehended committed it. 10 U.S.C.A. § 807 article 7(a) and (b).

5. [Appellant] was not in custody until after he orally admitted to murdering Adrianne Jones. The mere fact that a superior officer asks a serviceman to go to the OSI for purposes of an interview does not transform a voluntary act into an apprehension. Likewise, the fact that the interview occurs at the OSI does not transform a voluntary interview into an apprehension. Like its civilian counterparts, military law uses a totality of the circumstances test to determine when a serviceman is apprehended. Any restriction on [Appellant's] freedom was based upon his status as an active member of the armed forces and a Cadet, 4th Class.

6. The restriction of [Appellant] to the command center during the time period between the termination of the interview with civilian authorities and the trip to Denver for the polygraph examination also did not convert [Appellant's] volunteered cooperation with the investigation into apprehension or custody. The commander of a military installation has the authority to restrict a serviceman to quarters for the protection or benefit of the serviceman. The uncontroverted evidence supports the conclusion that [Appellant] was left at the command center in order to insure the validity of the polygraph. As such, the court concludes as a matter of law that [Appellant] was not 'apprehended' or 'in custody' until after he admitted his involvement. The OSI's leaving [Appellant] alone and unguarded, not handcuffed or restrained in any manner, for 20 minutes upon arrival at Buckley Air Force Base OSI is strong evidence that [Appellant] was not apprehended or in custody prior to his damaging admissions.

7. Assuming that [Appellant] was 'in custody' during police interrogation prior to his admissions, the court concludes that as a matter of law any taint from an illegal apprehension or arrest was sufficiently attenuated by the time [Appellant] made his written statement that the statement cannot be said to be a product of the illegal arrest or apprehension. [Appellant] was warned numerous times pursuant to both *Miranda* and the UCMJ that he did not have to cooperate with the officers. [Appellant] signed waivers indicating he understood his rights and that he was voluntarily cooperating with the investigation. [Appellant] was not deprived of any necessities and was fed and offered breaks. Probable cause developed when [Appellant] admitted his involvement after being told he failed the polygraph evaluations. A valid arrest warrant issued thereafter, but before [Appellant] agreed to provide a written statement. The interrogation was lengthened by [Appellant's] wanting the officers to guess what instrument was used to crush Adrianne Jones' head. Assuming custody occurred either at the initial confrontation with OSI Agent Stalvey or, more arguable, at the time [Appellant] was ordered to stay at the Command Center till it was time to go to the polygraph, more than 30 hours elapsed from when custody arguably occurred and when [Appellant] decided to provide a written statement. If custody occurred prior to [Appellant's] oral admissions, the custody is the result of [Appellant's] status as a first year cadet at the United States Air Force Academy and not attributable to any po-

lice misconduct. Under a totality of the circumstances test, this [trial] court concludes that if [Appellant] is deemed to have been in custody prior to the oral admissions, the taint of any unlawful apprehension or custody is sufficiently attenuated and the court concludes as a matter of law that the written statements and the subsequent oral statement were not the product of an illegal arrest or detention.

8. [Appellant's] written statement was not the product of any inducement, coercion, or promises.

9. The written statement was the product of [Appellant's] free will.

10. The warnings that appear on the face of the written statement are sufficient under the UCMJ and substantially comply with the requirements of Article 38.22 of the Texas Code of Criminal Procedure.

11. The [trial] Court finds as a matter of fact and concludes as a matter of law that [Appellant], after warnings by both the civilian and the military investigators, knowingly, intelligently, and voluntarily waived his right to counsel, his right to remain silent and his right to terminate any interview and voluntarily, knowingly, and intelligently cooperated with the investigation and both orally and in writing confessed to his involvement in Adrianne Jones' murder.

### PERSUASION OR COERCION

1. The [trial] Court finds and concludes that no promises were made to [Appellant] in order to induce him to provide a written statement. The Court further finds that [Appellant's] decision to cooperate with the investigation and provide a written account of his involvement was voluntary and was not based upon a promise that he would not be charged with capital murder or that the death penalty would be waived.

For these additional reasons, the Court finds as a matter of fact and concludes as a matter of law that the written statement was freely and voluntarily made.

### ORAL STATEMENTS TO DETECTIVE MEYERS

1. [Appellant's] admissions in the car regarding the murder weapon were not the product of custodial interrogation; therefore, the requirements of article 38.22 are inapplicable. Texas Code Crim. Proc. 38.22(5).

2. [Appellant] freely, knowingly, and intelligently volunteered the oral statements. There is no evidence that he was coerced in any manner prior to the making of the oral statements in the car to Meyers and Geary.

3. Because the oral statement regarding the gun was not the product of custodial interrogation and because the statements were voluntarily, knowingly and intelligently made the search warrant for [Appellant's] father's home is not invalidated. Additionally, the court finds as a matter of fact and concludes as a matter of law that [Appellant] failed to prove that he had standing to complain of the search of a residence in which he did not [reside]. There is no evidence that [Appellant] had a reasonable expectation of privacy in the contents of his father's attic. [Court Record 349–66]

As we are required to do, we give "almost total deference" to these findings of fact and conclusions of law, made after a lengthy evidentiary hearing. *Guzman*, 955 S.W.2d at 89. After careful consideration of those matters, it is clear that General Stein's desire that Appellant, a Cadet 4th Class, stay overnight and unrestrained at the command center before the next day's polygraph exam that Appellant had asked for was not an "apprehension" made without probable cause, nor did the circumstances and details of Appellant's

treatment at Buckley where he was left unguarded and unrestrained constitute an "apprehension" made without probable cause. The trial court's findings and conclusions are supported by the record and the trial court did not err by denying Appellant's motions to suppress. *See Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975) (when sufficient attenuating circumstances have occurred between the allegedly unconstitutional seizure and the making of a custodial statement, the statement cannot be said to be a product of illegal arrest and is admissible in evidence); *United States v. Harris,* 29 M.J. 169, 170 (C.M.A.1989) (civilian arrest is synonymous with military apprehension); *United States v. Garcia–Lopez,* 16 M.J. 229, 231 (C.M.A.1983); *United States v. Thomas,* 10 M.J. 687, 690 (A.C.M.R.1981) (military recognizes the concept of investigative detention that is enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968)); *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968) (Fourth Amendment does not proscribe investigative detention of a person who the investigating officer has reasonable suspicion to believe has been involved in a completed felony); *Estrada v. State,* 2 S.W.3d 401, 406 (Tex.App.—San Antonio 1999, no pet.) (pertaining to confessions, U.C.M.J. warnings informing a suspect of his rights are fully equivalent to the advice of rights required by article 38.22, section 2(a) of Texas Code of Criminal Procedure). We overrule issues seven, eight, nine, ten, eleven, and twelve.

### DENIAL OF INSTRUCTION ON DURESS OR THREAT

■ Appellant's thirteenth issue complains of the trial court's refusal of his request that the court instruct the jury that before they could consider his written statement for any purpose, the jurors must find beyond a reasonable doubt that the statement was made without duress or threat. Because there is no evidence that Appellant made or signed his written statement as a result of threat or duress, he was not entitled to that instruction. *See Bell v. State,* 938 S.W.2d 35, 48 (Tex. Crim.App.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997). We overrule issue thirteen.

### REQUEST TO LET ZAMORA MODEL AS DEMONSTRATIVE EXHIBIT

■ Appellant's fourteenth issue contends that the trial court erred by denying his request that Zamora be brought to his trial for demonstrative purposes. The record contains no evidence that she was willing to appear in that role, nor is there a bill of exceptions or other evidence in the record to establish the relevancy or what benefit Appellant or the jury would have received from a demonstration using Zamora herself as a model. Error on that point is not preserved. *See* TEX.R.APP. P. 33.1. We overrule issue fourteen.

### POLYGRAPH

■ Appellant's fifteenth and final issue maintains that the trial court erred by denying his motion for mistrial after the prosecutor violated a constraint of the motion in limine by remarking several times during opening statement about Appellant's polygraph exams. The first time the prosecutor mentioned a polygraph, Appellant objected that the remark violated the court's pretrial ruling on his motion in limine. The trial court sustained the objection and promptly instructed the jury:

> Ladies and gentlemen of the jury, during the trial of this case, there will be made mention that certain parties took a truth verification test, or a lie detector test, as it's commonly known, and it will be—in this state it has no evidentiary value. It has not [been] found to have the scientific basis to be submitted to you as evidence. So, there may be mention of the fact that one was used in the questioning of witnesses, but you are not to give it any weight or consideration as

evidence in the case of any truth or veracity of any party.

The trial court denied Appellant's motion for a mistrial. Later, the prosecutor mentioned "polygraph" again but the remark drew no objection from Appellant. The prosecutor's first mention of a polygraph was not so extreme as to inflame the jury and harm Appellant beyond the repairing balm of the court's instruction. We conclude that the court's instruction was sufficient to cure any harm done by the prosecutor's first mention of a polygraph. *See Lamons v. State*, 938 S.W.2d 774, 779 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd). And, by not objecting the next time the prosecutor mentioned a polygraph, Appellant waived all complaints about polygraph comments. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App. 1996), *cert. denied*, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997). We overrule issue fifteen.

### CONCLUSION

We have carefully considered each of Appellant's issues and finding no reversible error, we have overruled each issue Appellant has raised. Accordingly, we affirm the trial court's judgment.