**In re Ashley Paige BENTON, Relator.**

**No. 14–07–00804–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 16, 2007.

Brian W. Wice, Houston, TX, for relator.

Mia Magness, Houston, TX, for respondent.

Panel consists of Justices FOWLER, GUZMAN, and HUDSON.*

## OPINION

EVA M. GUZMAN, Justice.

In this original proceeding, relator, Ashley Paige Benton, seeks a writ of mandamus ordering respondent, the Honorable Devon Anderson, to vacate the gag order entered against relator, the trial attorneys, and the attorneys' agents and employees in the underlying criminal case. We conditionally grant the writ.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 6, 2006, members of two gangs known as MS–13 and Crazy Crew clashed in a Houston Park. During the ensuing fight, relator, who was then sixteen, stabbed fifteen-year-old Gabriel Granillo. Granillo died at the scene; relator was indicted for murder and certified to be tried as an adult.

On June 13, 2007, the State filed a motion for entry of a gag order. The State asked the respondent to take judicial notice of "(1) the unusually emotional nature of the issues involved in this case; (2) the extensive local media coverage this case has already generated; and (3) the various and numerous media interviews with the defendant and counsel for the defendant that have been published and broadcast by local media." Respondent did not grant the motion at that time. The case went to trial, and on June 29, 2007, respondent declared a mistrial after the jury was unable to reach a verdict.

Relator and the State then entered plea bargain negotiations. On Thursday, July 12, 2007, the following article about these negotiations appeared in the *Houston Chronicle:*

* Senior Justice J. Harvey Hudson sitting by assignment.

Ashley Benton's attorneys will try again to negotiate a plea bargain today for the stabbing death of gang leader Gabriel Granillo.

Attorney Rick DeToto said prosecutors made an offer Wednesday, which was rejected. He said he will make a counteroffer today but doesn't expect to reach an agreement. If negotiations break down, Benton will get a date for a retrial.

"We could go to trial tomorrow if we had to," DeToto said.

Benton, 17, who is charged with murder, was tried last month for stabbing the 15–year–old boy in the heart during a midafternoon gang fight in Ervan Chew Park in June 2006. The week-and-a-half-long trial ended in a mistrial after the jury deadlocked after almost 18 hours of deliberations.

DeToto refused to say what the offer was, except to say that Benton did not want to plead guilty to murder.

The following day, another story elaborating on the proposed plea bargain appeared in the *Houston Chronicle:*

Ashley Benton's lawyers rejected an offer from prosecutors that called for a murder plea with no prison time in the stabbing death of a gang member, one of her defense attorneys said Thursday.

Prosecutors presented a second offer Thursday morning, but defense lawyer Kent Schaffer said he would not discuss details of that deal.

· · ·

Schaffer said the first offer from prosecutors included 10 years of deferred adjudication for the 17–year–old, a form of probation where defendants avoid conviction if they complete the terms.

He said Benton's camp is hoping for a lesser charge, such as aggravated assault, and a shorter probationary term.

At a hearing on Friday, July 13, 2007, relator informed respondent that she was rejecting the State's plea bargain. At that time, respondent set the case for retrial on January 4, 2008. Respondent also informed the parties that she would reconsider the State's motion for a gag order and instructed the attorneys not to discuss the particulars of the plea bargain negotiations.

On Saturday, July 14, 2007, the *Houston Chronicle* again reported on the plea bargain:

Ashley Benton will face a second trial Jan. 4 for last year's stabbing death of a gang member after she rejected a second plea agreement offer from prosecutors Friday.

Attorneys would not discuss details of the second offer.

The first offer, rejected in court Thursday, called for a murder conviction, no prison time and 10 years of deferred adjudication, one of her defense attorneys confirmed in interviews later that afternoon.

More than six weeks later, the trial court held a hearing on the State's motion for entry of a gag order. The State presented videotapes of television news reports and newspaper articles concerning Granillo's death, the charges against relator, relator's first trial, and the plea bargain negotiations. Relator presented five affidavits from attorneys who had represented defendants in other highly-publicized criminal trials. These included affidavits from (a) Allen Tanner, lead counsel for Angel Maturino Resendiz, "dubbed the 'Railcar Killer' by the local and national media";[1] (b) Stanley Schneider, co-counsel

---

1. The facts of this case and evidence of extra- neous offenses are discussed in *Resendiz v.*

in the capital murder trial of Robert Angleton;[2] (c) Wendell Odom, Jr., co-counsel in both capital murder trials of Andrea Yates;[3] (d) Chip Lewis, co-counsel for Kenneth Lay in one of the "Enron trials"[4] and co-counsel in the murder trial of Robert Durst;[5] and (e) Dan Cogdell, who was involved as counsel in cases commonly referred to as the "Slave Ranch" case, the "Cadet Murders,"[6] the "Houston City Hall Bribery Trial," and another of the Enron trials. In essence, each affiant stated, "In my opinion, there was as much if not more, publicity surrounding [the affiant's case] than there was in the Ashley Benton case. In spite of this, we had no problem seating a jury ... and there was no gag order entered."[7] In his affidavit, attorney Chip Lewis further attested that when he acted as co-counsel in the Galveston murder trial of Robert Durst, "we seated a jury ..., even though Galveston County's jury pool is far smaller than the jury pool in Harris County, and there was no gag order entered...." Respondent excluded six additional affidavits that originally had been offered by the Harris County District Attorney's Office in an unrelated criminal trial as evidence in opposition to the accused's request for a change of venue. Among the items excluded was the affidavit of Karen Richards, Program Administrator for Voter Registration, who stated that in 2005, the list of potential jurors in Harris County included the names of 2,807,640 people.

Respondent granted the State's request for a gag order and entered the following Order Restricting Extrajudicial Statements, which provides, in relevant part:

1. On August 8, 2006, the State charged the Defendant with murder. The State accused the Defendant of stabbing Gabriel Granillo to death in an ostensible gang fight. The Defendant's case generated substantial publicity from the date of the stabbing.

2. The Defendant pled not guilty to the State's allegations, and the case was tried before a jury. On June 29, 2007, the Court declared a mistrial and discharged the jury, because the jury was unable to reach a verdict.

3. The Defendant's case, before, during and after trial, generated extensive media coverage and publicity. The Court set the Defendant's case for a second trial in January 2008, with the hope that publicity surrounding the case would decline by that time and interfere less with the Defendant's right to a fair trial and impartial jury.

4. On more than one occasion, the Court has admonished trial counsel

State. *112 S.W.3d 541 (Tex.Crim.App.2003) (en banc).*

2. *See Angleton v. State,* 971 S.W.2d 65 (Tex. Crim.App.1998) (en banc).

3. *See Yates v. State,* 171 S.W.3d 215 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd.); *Ex parte Yates,* 193 S.W.3d 149 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (mem.op.).

4. A brief summary of events connected with Lay are addressed in *In re Arthur Andersen,*

*L.L.P.* 121 S.W.3d 471 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding).

5. *See In re Durst,* 148 S.W.3d 496 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (maj. op. on reh'g.)

6. *See Graham v. State,* 3 S.W.3d 272 (Tex. App.-Fort Worth 1999, pet. ref'd); *Zamora v. State,* 998 S.W.2d 290 (Tex.App.-Fort Worth 1999, pet. ref'd)

7. This language is taken from the affidavit of Allen Tanner; similar language is found in the remaining affidavits.

to try the case in court and not in the media. The Court made clear its expectations that counsel adhere to the letter and spirit of Texas Code of Professional Responsibility provisions governing extrajudicial statements to the media. The Court's expectations were not met.

5. Before, during and after the Defendant's trial, counsel for the Defendant exhibited an extraordinary willingness to grant interviews to the media. Various media outlets published numerous interviews with trial counsel and many stories about the Defendant's case.

6. Despite the Court's admonishments, before, during and after the Defendant's trial, counsel for the Defendant continued to make extrajudicial statements to the media that violated TEX. DISCIPLINARY R. PROF'L CONDUCT 3.07, *reprinted in* TEX. GOV'T CODE, tit. 2 subtit[.] G app[.] A (Tex. State Bar R. art. 10, § 9).

7. For instance, after the Defendant's trial, counsel for the Defendant discussed the parties['] attempts to reach a plea-bargain agreement with the media in detail. Counsel's extrajudicial statements included the explicit terms of the State's offer.

8. Counsel's continued, numerous, extrajudicial statements to the media increase the publicity surrounding the case, thereby potentially jeopardizing the Court's ability to seat an impartial jury in this case.

9. Counsel's apparent willingness to continue to make inappropriate and unethical extrajudicial statements to the media poses an obvious and specific, serious threat to the judicial process that is likely to interfere with the Defendant's fair trial rights and prejudice potential jurors.

10. There is a substantial probability that the Defendant's fair trial rights will be prejudiced by publicity that an order restricting extrajudicial commentary by trial counsel for the Defendant and the State would prevent. Further less restrictive alternatives to such an order cannot adequately protect the Defendant's fair trial rights.

11. The Court has a duty to preserve the Defendant's fair trial rights and a duty to ensure as much as possible that pretrial publicity does not impermissibly influence the jury.

12. An order restricting extrajudicial commentary by trial counsel for the Defendant and the State is necessary to protect the Defendant's rights and deal with this obvious[,] imminent and severe threat to the judicial process.

13. While the Court is mindful of the great contributions the media has made to our society and that the First Amendment is an important right afforded by our Constitution, freedom of expression must, under these circumstances, yield to the Defendant's right to a fair trial.

In light of the foregoing, the Court FINDS the following restrictions are necessary and designed to protect the judicial system's integrity and the Defendant's fair trial rights.

Accordingly, in the interest of justice and in light of the relevant facts and circumstances of this case, the Court ORDERS, ADJUDGES and DECREES that prior to and during the trial in cause number 1079641, the Defendant, all attorneys, and all attorney's staff, employees and/or agents associated with

or participating in this case, shall refrain from making any extrajudicial statements relating to one or more of the following subjects:

1. The character, credibility, reputation, or criminal record of an attorney, a juror, a party, or a witness in the case;
2. The possibility of a guilty plea and the substance or details of any plea-bargain negotiations;
3. The identity of a witness or the expected testimony of a party or witness;
4. The contents of any pretrial confessions, admissions, statement, or examination given or taken by the defendant or the defendant's refusal or failure to make any statement;
5. Any opinion of the Defendant's guilt or innocence;
6. The identity or nature of physical evidence expected to be presented at trial or the absence of such physical evidence;
7. The jury's composition, any juror's identity, or the contents of any communications from or to the jury during deliberations;
8. The strengths or weaknesses of either party's case;
9. Any other information an attorney knows or reasonably should know is likely to be inadmissible as evidence and would create a substantial risk of prejudice if disclosed.

This Order shall NOT prohibit attorneys from communicating with the parties or their witnesses in order to prepare for trial. Nor shall this Order prohibit the public from attending any sessions before the Court or from publishing any information they obtain from observing proceedings in this case.

Nothing in this Order shall prohibit any individual from making any extrajudicial statements *without elaboration or characterization* relating to one or more of the following subjects:

1. The general nature of the case, an allegation or defense;
2. Information contained in the public record;
3. The scheduling or result of any step in this proceeding; or
4. The contents or substance of any motion or step in the proceeding, to the extent that such motion of [sic] step in the proceeding is a matter of public record.

Relator contends that the trial court's gag order violates the free speech guarantees of the Texas Constitution. She argues that respondent improperly based the gag order on the quantity of extrajudicial statements rather than on the content of those statements. Relator further asserts that respondent's findings and the evidence are insufficient to establish the likelihood of the required level of prejudice to the integrity of the judicial process or the imminence of any such harm. Moreover, relator contends that respondent's findings reflect a failure to adequately consider less restrictive alternatives. Relator also challenges the exclusion of several affidavits offered as evidence in opposition to the State's motion.

## II. MANDAMUS STANDARD OF REVIEW

Mandamus is the appropriate method by which to challenge a gag order. *San Antonio Express–News v. Roman,* 861 S.W.2d 265, 266 (Tex.App.-San Antonio 1993, orig. proceeding). To demonstrate the right to mandamus relief, the relator must establish that (a) the trial court clearly abused its discretion, and (b) the relator has no adequate remedy by appeal. *In re Southwestern Bell Tel. Co., L.P.,* 226 S.W.3d 400, 403 (Tex.2007); *In re Houston Chronicle Publ'g Co.,* 64 S.W.3d 103, 106

(Tex.App.-Houston [14th Dist.] 2001, orig. proceeding). The trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig.proceeding).

## III. PRIORITY OF REVIEW

Relator primarily argues that the trial court's gag order infringes on the State constitutional rights of those affected; however, she relies heavily on federal law. It is therefore helpful to discuss the protections provided under the federal as well as the state constitutions. Because an understanding of federal rights is helpful to understanding state rights, and because federal constitutional law affords at least as much protection to the right of free speech as the Texas Constitution, we place the state free speech guarantee in context by first considering the analogous federal right.[8]

## IV. FEDERAL CONSTITUTIONAL REQUIREMENTS FOR PRIOR RESTRAINT OF SPEECH

■ When considering whether to issue a gag order affecting attorneys and parties, federal courts consider three factors. "First, the court must consider whether the requested order is narrowly tailored." *United States v. Carmichael*, 326 F.Supp.2d 1267, 1293 (M.D.Ala.2004) (collecting cases). Next, the court determines whether a gag order is the least restrictive means, or if less burdensome alternatives would achieve the same governmental objective. *Id.* Finally, the court applies the "threshold standard for imposing a prior restraint." *Id.*

But courts do not agree on the appropriate threshold standard. As summarized in *Carmichael*:

> A three-way circuit split exists with respect to the third, and most important, factor to be considered: the threshold standard for imposing a prior restraint. The United States Courts of Appeals for the Sixth, Seventh, and Ninth Circuits have held that, before the court may issue an order restricting the speech of trial participants, it must find that the speech at issue presents a "clear and present danger" or a "serious and imminent threat" to a fair trial. The Courts of Appeals for the Third and Fifth Cir-

---

8. We note that when deciding issues raised under both federal and state constitutional law, the Texas Supreme Court has followed varying approaches in determining which body of law to address first. In *Davenport v. Garcia*, the Court stated that "[b]asing decisions on the state constitution whenever possible avoids unnecessary federal review. This not only lessens federal interference into state issues, but also results in 'efficient judicial management.'" 834 S.W.2d 4, 17 (Tex.1992) (quoting Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts*, 63 TEX. L. REV. 977, 984 (1985)). The Court continued, "The soundest way to avoid such unnecessary review and delay for litigants is to rely on the state constitution in the first instance." *Id.* at 18. Subsequently, however, the Court has examined federal constitutional law first if the United States Supreme Court "has recently addressed the application of the First Amendment" in a similar context. *Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 429–30 (Tex.1998); *Operation Rescue–National v. Planned Parenthood of Houston & Southeast Tex., Inc.*, 975 S.W.2d 546, 556 (Tex. 1998) (analyzing abortion protesters' First Amendment claim before Texas constitutional claim because the United States Supreme Court had recently written an opinion regarding the application of the federal constitution in an abortion protest context). Most recently, the Court has held, "No rigid order of analysis is necessary, despite occasional language to the contrary in some of our opinions." *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex.2002).

cuits have adopted the "substantial likelihood of material prejudice" standard. The Fourth and Tenth Circuits have held that the appropriate standard is "reasonable likelihood" of prejudice.

*Id.* (citations omitted). And interestingly, the dispute between relator and the State concerning the state constitutional threshold for prior restraint of speech mirrors the split among the circuit courts concerning the federal constitutional threshold.

## V. PROPOSED STANDARDS FOR REVIEWING GAG ORDERS UNDER THE TEXAS CONSTITUTION

### A. *Davenport v. Garcia*

Relator urges us to review the order for a violation of state constitutional law by applying the standard set forth by the Texas Supreme Court in *Davenport v. Garcia.* 834 S.W.2d 4, 10 (Tex.1992) (orig.proceeding). In *Davenport,* the Texas Supreme Court concluded that the Texas Constitution provides greater protection of speech than the United States Constitution and held that prior restraints on speech in a civil case are presumptively unconstitutional under Article I, Section 8 of the Texas Constitution. *Id.* at 7–9; *compare* U.S. CONST. amend. I ("Congress shall make no law . . . abridging the freedom of speech, or of the press.") *with* TEX. CONST. art. I, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."). The *Davenport* court concluded that a gag order in a civil proceeding will withstand state constitutional scrutiny only if there are specific findings supported by evidence that:

   (1) an imminent and irreparable harm to the judicial process will deprive

litigants of a just resolution of their dispute, and

   (2) the judicial action represents the least restrictive means to prevent that harm.

*Davenport,* 834 S.W.2d at 10.

Although *Davenport* involved a gag order in a civil case, it has been applied to similar orders in criminal cases. *See In re Graves,* 217 S.W.3d 744, 753 (Tex.App.-Waco 2007, orig. proceeding) (holding, under *Davenport,* that the trial court abused its discretion by issuing a gag order without sufficiently specific findings to support the order under the Texas Constitution); *San Antonio Express–News,* 861 S.W.2d at 268 (holding the *Davenport* test applicable in determining the validity of a prior restraint of speech in a criminal proceeding). The Fourth Court of Appeals further concluded that the application of *Davenport* to criminal proceedings is an appropriate means of protecting the public's right of access to criminal trials and proceedings and free speech through the dissemination of public information. *San Antonio Express–News,* 861 S.W.2d at 268.

### B. *United States v. Brown*

The State, on the other hand, argues that *Davenport* should be limited to civil cases because, in reaching its conclusions, the *Davenport* Court gave no consideration to the constitutional right of a defendant to a fair and impartial jury. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."). The State further contends that "unfettered public discourse" by trial participants subject solely to the "imminent and irreparable harm" standard means the jury must be tainted before a gag order may issue. Relying primarily on the Fifth Circuit Court of Appeals'

opinion in *United States v. Brown*,[9] the State urges us to conclude that prior restraints on the speech of participants in a criminal trial are available if there is a substantial likelihood that the extrajudicial comments will undermine a fair trial. In other words, the State urges us to apply the standard followed by the Fifth Circuit in reviewing alleged infringement of federal constitutional rights.[10] The State further argues that this standard has been satisfied in this case.

Although the United States Supreme Court has found that the "substantial likelihood of material prejudice" test protected an attorney's First Amendment rights under some circumstances, such language is subject to wide variance in interpretation. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1076, 111 S.Ct. 2720, 2745, 115 L.Ed.2d 888 (1991) (plurality op.).[11] Thus, writing separately in *Gentile*, Justice Kennedy stated, "Interpreted in a proper and narrow way ... the phrase [']substantial likelihood of material prejudice['] might punish only speech that creates a danger of imminent and substantial harm." *Id.* at 1036, 111 S.Ct. at 2725 (Kennedy, J., joined by Marshall, Blackmun, and Stevens, J.J.). And although there are significant differences between the instant case and *Gentile*, the latter is instructive on the necessity and scope of permissible speech, even under the lower standard recommended here by the State.

## C. Gentile v. State Bar of Nevada

In *Gentile*, a lawyer held a press conference just hours after his client had been indicted on criminal charges, asserting that the State sought the indictment and conviction of an innocent person as a scapegoat and had not "been honest enough to indict the people who did it; the police department, crooked cops." *Id.* at 1033–34, 111 S.Ct. at 2723–24. He referred to the "so-called other victims" as "known drug dealers and convicted money launderers" and named a police detective as the perpetrator of the crimes with which Gentile's client was charged. *Id.* at 1063, 111 S.Ct. at 2739. After his client was tried and acquitted on all counts, the State Bar reprimanded Gentile for violating Nevada Supreme Court Rule 177(1), which prohibits the dissemination of information that a lawyer knows or reasonably should know will have " 'a substantial likelihood of prejudicing an adjudicative proceeding.' " *Id.* (quoting Nevada SCR

9. 218 F.3d 415 (5th Cir.2000).

10. The State alternatively advocates a "reasonable likelihood" standard, which some courts have applied to free speech claims under the First Amendment. *See, e.g., In re Dow Jones & Co.*, 842 F.2d 603, 606 (2d Cir.1988); *In re Russell*, 726 F.2d 1007, 1010 (4th Cir.1984); *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir.1969); *South Bend Tribune v. Elkhart Cir. Court*, 691 N.E.2d 200, 202 (Ind.App.1998); *Sioux Falls Argus Leader v. Miller*, 610 N.W.2d 76, 86 (S.D.2000). But the Texas Court of Criminal Appeals has acknowledged that both it and the Texas Supreme Court have interpreted the Texas Constitution as providing greater protection in some instances than does the federal constitu-

tion. *Ex parte Mitchell*, 977 S.W.2d 575, 580 (Tex.Crim.App.1997); *see also Heitman v. State*, 815 S.W.2d 681, 690 (Tex.Crim.App. 1991) (quoting *LeCroy v. Hanlon*, 713 S.W.2d 335, 338 (Tex.1986)) (" 'The federal constitution sets the floor for individual rights; state constitutions establish the ceiling.' "). And the "substantial likelihood" standard connotes a stronger showing than the "reasonable likelihood" standard. *Brown*, 218 F.3d at 427. Because, as discussed *infra*, the "substantial likelihood" standard is the "constitutional minimum," the lower "reasonable likelihood" does not apply.

11. This is a lower standard than that which applies to the media. *Gentile*, 501 U.S. at 1070–71, 111 S.Ct. at 2742–43.

177(1)).[12] Thus, the standard analyzed by the Court—a substantial likelihood of material prejudice—necessarily was derived from the Rule that Gentile allegedly violated.

In reviewing the attorney's challenge to this Rule, the Court noted that "the criminal justice system exists in a larger context of a government ultimately of the people, who wish to be informed about happenings in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system." *Id.* at 1070, 111 S.Ct. at 2742. Justice Kennedy elaborated on the important role played by the media in providing coverage of criminal proceedings:

> The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations.[13] "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted."[14] Public vigilance serves us well, for "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.... Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account."[15]

As we said in *Bridges v. California,*[16] limits upon public comment about pending cases are "likely to fall not only at a crucial time but upon the most important topics of discussion.... ["][17]

"No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression."[18]

In *Sheppard v. Maxwell,*[19] we reminded that "[t]he press ... guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism."

*Id.* at 1035, 111 S.Ct. 2720, 2724–25 (citations moved to footnotes). Reading the Nevada rule narrowly, the Court concluded that the speech for which Gentile was sanctioned did not present a substantial likelihood of material prejudice.

### D. *Gentile* Represents the State "Constitutional Minimum"

*Gentile,* of course, addresses speech protected by the First Amendment of the United States Constitution, and does not directly address speech protected by state constitutions. Under Texas law, however, the *Gentile* standard is treated as the "constitutional minimum." *Benton,* 980 S.W.2d at 431. As in *Gentile,* Texas courts apply this minimum standard when re-

---

12. This rule is analogous to Texas Disciplinary Rule of Professional Conduct 3.07(a).

13. Citing *Landmark Commc'ns, Inc. v. Virginia,* 435 U.S. 829, 838–39, 98 S.Ct. 1535, 1541–42, 56 L.Ed.2d 1 (1978).

14. Quoting *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 575, 100 S.Ct. 2814, 2826, 65 L.Ed.2d 973(1980).

15. Quoting *In re Oliver,* 333 U.S. 257, 270–71, 68 S.Ct. 499, 506–07, 92 L.Ed. 682 (1948).

16. 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, (1941).

17. Citing *Bridges,* 314 U.S. at 268–69, 62 S.Ct. at 196–97.

18. *Id.*

19. 384 U.S. 333, 350, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966).

viewing sanctions of an attorney's speech that violated an applicable state rule of professional conduct. *Id.* at 434. Thus, this standard applies to speech that has already occurred.

But Texas courts have consistently applied a higher standard when reviewing prior restraints of speech. *Id.* ("The cases in which this Court has held the Texas Constitution to create a higher standard than the First Amendment have involved prior restraints in the form of court orders prohibiting or restricting speech."); *Ex parte Tucci,* 859 S.W.2d 1, 19–26 (Tex. 1993); *Davenport,* 834 S.W.2d at 10; *Graves,* 217 S.W.3d at 753; *San Antonio Express–News,* 861 S.W.2d at 268.

Here, however, we need not determine whether the higher *Davenport* standard applies in this criminal case, because the record and the findings do not support the imposition of a gag order even under the lower standards articulated in *Gentile* and *Brown.* Specifically, the findings and the evidence do not establish, as a "constitutional minimum," that the order was narrowly-tailored [20] to avert a substantial likelihood of material prejudice.[21]

## VI. SUBSTANTIAL LIKELIHOOD OF MATERIAL PREJUDICE

### A. Right to a Fair Trial

Although both the State and a criminal defendant have the right to a fair trial, respondent primarily focused on relator's right to a fair trial and an impartial jury. In fact, the order refers eight times to relator's right to a fair trial. And although the text of the Sixth Amendment addresses only the rights of the accused, in Texas "[i]t is the duty of the trial court, the attorney representing the accused, the attorney representing the state and all peace officers to so conduct themselves as to insure a fair trial *for both the state and the defendant,* not impair the presumption of innocence, and at the same time afford the public the benefits of a free press." TEX.CODE CRIM. PROC. ANN. art. 2.03(b) (Vernon 2005) (emphasis added). We therefore review the findings and the record for evidence that future extrajudicial statements by relator, counsel, or the employees or agents of counsel involved in the case are substantially likely to cause material prejudice to the judicial proceedings.

### B. No Supported Finding of Prejudice

■ We first note that there is only one finding potentially identifying a matter that, discussed with the press, may have caused or could cause prejudice. Instead, it appears from the wording of the order that respondent presumed that publicity is inherently prejudicial to a criminal defendant. In language such as the following, respondent emphasized the quantity of publicity over its content or even its effects:

---

**20.** The restraint on speech is narrowly tailored to achieve [governmental] objectives. The regulation of attorneys' speech is limited-it applies only to speech that is substantially likely to have a materially prejudicial effect; it is neutral as to points of view, applying equally to all attorneys participating in a pending case; and it merely postpones the attorneys' comments until after the trial. *Gentile,* 501 U.S. at 1076, 111 S.Ct. at 2745. Because relator does not specifically challenge the order as overly broad, we do not address this requirement further.

**21.** *Id.* Relator also argues that the gag order is not the least restrictive means to fulfill the government's objective. Because we conclude that the findings and evidence are insufficient to demonstrate a substantial likelihood of material prejudice, we need not address the argument that such prejudice could be averted by less restrictive means.

The Defendant's case generated substantial publicity from the date of the stabbing.

. . .

The Defendant's case, before, during and after trial, generated extensive media coverage and publicity.

. . .

Before, during and after the Defendant's trial, counsel for the Defendant exhibited an extraordinary willingness to grant interviews to the media. Various media outlets published numerous interviews with trial counsel and many stories about the Defendant's case.

. . .

Counsel's continued, numerous, extrajudicial statements to the media increase the publicity surrounding the case, *thereby potentially jeopardizing the Court's ability to seat an impartial jury in the case.*

(emphasis added). But there has been no showing that such publicity is materially prejudicial. Even pervasive and concentrated publicity is not prejudicial per se. *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 565, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (1976).

■ There is no requirement that qualified jurors be totally ignorant of the facts and issues involved in a case. *Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961); *see also Etheridge v. State,* 903 S.W.2d 1, 6 (Tex.

Crim.App.1994) ("Extensive knowledge in the community of either the crime or the defendant, without more, is insufficient to render a trial unconstitutional.") (citing *Faulder v. State,* 745 S.W.2d 327, 339 (Tex. Crim.App.1987) (en banc)). Rather, publicity about the case must be so pervasive, prejudicial, and inflammatory that there is a substantial likelihood that prospective jurors' initial opinions cannot be set aside. *See Etheridge,* 903 S.W.2d at 6.

The previous disclosure of the details of a plea bargain negotiation has not been shown to be materially prejudicial to these proceedings. Respondent apparently concluded that counsel for relator passed this information to the press, and thereby violated Texas Disciplinary Rule of Professional Conduct 3.07. This Rule prohibits a lawyer from making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding." TEX. DISCIPLINARY R. PROF'L CONDUCT 3.07. Thus, a violation occurs only if the lawyer (1) would have expected the information to be disseminated,[22] and (2) knew or reasonably should have known that the statement would pose a substantial likelihood of material prejudice. Here, there is no evidence supporting the second prong of the test. Regardless of how the information came to the attention of the press, the record does not support a finding that a single disclosure of plea bargain information or even publicity in general presented

22. We note that Relator's counsel represented to the trial court that a defense attorney did not relay this information to the media, but instead, the information was obtained by or from a person who overheard a privileged conversation between an attorney and an investigator in a courthouse hallway. We further note that the trial court answered this statement by saying, "I will take you at your word as an officer of this court, Mr. DeToto." The State did not controvert this matter.

a substantial likelihood of material prejudice.[23]

Even if one assumes that disclosure of the details of plea bargain negotiations would be prejudicial when the disclosure occurs immediately before trial, these reports appeared approximately six months before relator's second trial, which was scheduled for January 2008. Considering the specific statements at issue, we see no substantial likelihood of material prejudice when such a significant period of time elapses between the statements and the seating of a jury. *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984) ("[I]t is clear that the passage of time between a first and a second trial can be a highly relevant fact."); *Levine v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 764 F.2d 590, 598 (9th Cir.1985) (noting that publicity immediately prior to trial "has a greater potential for prejudice than publicity months in advance of trial"); *Chase v. Robson*, 435 F.2d 1059, 1061 (7th Cir.1970) (holding that newspaper articles that were seven months old at the time of the gag order and the trial were insufficient to support "the proposition that the defendants' future first amendment utterances, if any, would interfere with the fair administration of the trial"). Respondent's order cites no other alleged violation of Rule 3.07 or any other improper extrajudicial statements, but, in-stead, offers only this one specific occurrence as an example. The record does not demonstrate that defense counsel made additional disclosures or would make similar disclosures in the future. To the contrary, the *Houston Chronicle* reported that relator's counsel refused to discuss the details of a second plea bargain negotiation.

The State contends the July 2007 disclosure is but one instance of defense counsel's improper extrajudicial statements and refers us to two other statements that appeared in the *Houston Chronicle*. The first statement appeared in an article dated July 8, 2006. There, DeToto is quoted as stating, "Mr. Granillo [complainant] swung a bat at her, not once, but twice ... That's when [relator] reacted. The idea that those young men were just strolling through the park picking flowers is bull[——]." The second article, dated July 14, 2006, contains the statement that De-Toto "said Wednesday that he briefly saw a Houston police offense report in which Villatoro acknowledged he and the Granillo brothers were members of the violent MS–13 gang."

But these statements do not support the trial court's order. Defense counsel made these statements to the press nearly a year before relator's first trial, and more than a year before the trial court's order.[24]

---

**23.** Arguably, a greater threat to relator's right to a fair trial may arise from the gag order because, of all the witnesses to the fight and to Granillo's death, only relator is barred from speaking to the press. The order additionally expressly bars counsel for relator from publicly denying her culpability, despite the fact that relator's plea of "not guilty" is a matter of public record. *See id.*, cmt. 3 ("[A]n otherwise objectionable statement may be excusable if reasonably calculated to counter the unfair prejudicial effect of another public statement.").

**24.** If any prejudice resulted from these statements, one could expect that such prejudice would have made it difficult to empanel an impartial jury in the first trial. *See Yount*, 467 U.S. at 1032, 104 S.Ct. at 2889 ("In this case, the extensive adverse publicity and the community's sense of outrage were at their height prior to Yount's first trial...."). Here, however, the State does not dispute that of 120 venire members, only a handful of jurors were removed for cause. *Cf. id.* at 1029, 104 S.Ct. at 2888 ("[Seventy-seven percent of venire members] admitted they would carry an opinion into the jury box."); *Irvin*, 366 U.S.

Moreover, evidence about the gang membership of the decedent and various witnesses and the details of relator's and the decedent's respective roles in the fight were the subject of testimony during the first trial; thus, this material is now a matter of public record. No incremental increase in prejudice from future statements has been shown.

With the exception of the disclosure of one plea bargain negotiation purportedly made by defense counsel, our review of the news articles and broadcasts reveals nothing more than defense counsels' assertions of relator's innocence based on self-defense, reports of trial proceedings, and reasonable inferences from witness testimony. A number of newspaper articles are merely reports of the trial proceedings and contain no extrajudicial comments attributed to counsel. In sum, the material does not present a substantial likelihood of material prejudice:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin,* 366 U.S. at 722–23, 81 S.Ct. at 1642–43.

Finally, despite respondent's exclusion of evidence of the number of potential jurors in Harris County, we are not unaware that Harris County, with its millions of residents, is the most populous county in Texas and one of the most populous counties in the entire nation. We cannot say that the content of the publicity thus far, including the disclosure of details of a single plea bargain negotiation, could result in such prejudice that the trial court's ability to seat twelve impartial jurors would be jeopardized in the absence of a gag order. *Cf. Neb. Press Ass'n,* 427 U.S. at 563 n. 7, 96 S.Ct. at 2805 n. 7 ("[T]he combined population of Lincoln County and the adjacent counties is over 80,000 providing a substantial pool of prospective jurors."); *Columbia Broad. Sys., Inc. v. U.S. Dist. Ct. for the Cent. Dist. of Cal.,* 729 F.2d 1174, 1181 (9th Cir.1984) ("[I]n a populous metropolitan area, the pool of potential jurors is so large that even in cases attracting extensive and inflammatory publicity, it is usually possible to find an adequate number of untainted jurors.").

We recognize there may be cases in which the record shows that material prejudice from extrajudicial statements is so likely that the trial court could act within its discretion in imposing prior restraint on the speech of trial participants. *See Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966) (stating trial courts should take steps to protect processes from prejudicial outside influences, and prosecutors, defense counsel, the defendant, witnesses, court staff, and law enforcement should not be permitted to frustrate that function). However, it is only the occasional case that presents a danger of prejudice from pretrial publicity. *Gentile,* 501 U.S. at 1054, 111 S.Ct. 2720 (Kennedy, J., concurring); *see also In*

---

at 727, 81 S.Ct. at 1645 (268 members of a panel of 430 potential jurors excused for cause). Moreover, the State does not contend (and the trial court did not find) that any excused venire person was prejudiced by ex-

trajudicial statements by trial participants rather than by media reports of public information or of material independently obtained by journalists from other sources.

*re Houston Chronicle Publ'g Co.,* 64 S.W.3d at 105 (refusing non-party newspaper's request to set aside gag order directed to trial participants in the intensely publicized *Yates* murder trial).[25] Thus far, this is not such a case. We therefore hold that respondent abused her discretion in entering the gag order under review.

## VII.  CONCLUSION

Because no appealable order has been entered, we conclude relator has no adequate remedy by appeal. *See San Antonio Express–News,* 861 S.W.2d at 267 (finding the relator had no adequate legal remedy because no appealable order had been entered, and relators could only test the gag order by violating it and subjecting themselves to contempt proceedings).[26] Accordingly, we conditionally grant the petition for a writ of mandamus directing the trial court to vacate its gag order. The

25.  In *In re Houston Chronicle,* the prior restraint on speech was not the subject of a constitutional challenge from any individual who was the subject of the order.

26.  Relator also contends that respondent abused her discretion in excluding six affidavits which relator offered into evidence at the hearing on the gag order. The six affidavits are the affidavits the Harris County District Attorney's Office introduced in support of its opposition to the defendant's request for a change of venue in the case of *State v. Slade,* Cause Nos. 1121606 & 1121607 (338th Dist. Ct., Harris County, Tex. July 16, 2007; July 17, 2007; July 31, 2007; July 26, 2007; & Aug. 2, 2007). Respondent sustained the State's objection that the affidavits were not relevant because they were submitted in an unrelated case on the issue of venue. We conclude the affidavits were, in fact, relevant because they are material to a fact in issue, i.e., that fair and impartial juries have been seated in highly publicized cases in Harris County, and they make that fact more probable than it would be without the affidavits. *See Miller v. State,* 36 S.W.3d 503, 507 (Tex. Crim.App.2001). Therefore, we also conclude

writ will issue only if the trial court fails to act in accordance with this opinion.

respondent abused her discretion in excluding these affidavits from evidence.

