WR-83,719-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 9/14/2015 4:10:01 PM
Accepted 9/15/2015 8:45:28 AM
ABEL ACOSTA
CLERK

# TEXAS COURT OF CRIMINAL APPEALS

RECEIVED IN
COURT OF CRIMINAL APPEALS

September 16, 2015

ABEL ACOSTA, CLERK

## CASE NO.

## WR-83, 719-01

IN RE STATE OF TEXAS EX REL. ABELINO REYNA,
*Relator*

Trial Cause No. 2015-1955-2
In the 54th District Court, McLennan County

Appellate Cause No. 10-14-00235-CR
10th Court of Appeals
Waco, Texas

**BRIEF OF *AMICI CURIAE* THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 24 MEDIA ORGANIZATIONS\* IN OPPOSITION TO RELATOR'S APPLICATION FOR WRIT OF MANDAMUS**

Hannah Bloch-Wehba
State Bar No. 24087175
hblochwehba@rcfp.org
    *Counsel of Record*
Bruce D. Brown
Katie Townsend
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1250
Washington, D.C. 20005
Tel.: (202) 795-9300
Fax: (202) 795-9310

\* A full list of *amici* is reproduced
on the next page

# IDENTITY OF *AMICI CURIAE*

The Reporters Committee for Freedom of the Press
American Society of News Editors
The Associated Press
Association of Alternative Newsmedia
Courthouse News Service
Cox Media Group, Inc.
First Amendment Coalition
First Look Media, Inc.
Gannett Co., Inc.
Hearst Corporation
Investigative Reporting Workshop at American University
MPA – The Association of Magazine Media
National Association of Black Journalists
National Newspaper Association
The National Press Club
National Press Photographers Association
The New York Times Company
The News Guild – CWA
Newspaper Association of America
Online News Association
Radio Television Digital News Association
Society of Professional Journalists
The Star-Telegram
Texas Press Association
Tully Center for Free Speech

# TABLE OF CONTENTS

IDENTITY OF *AMICI CURIAE* .................................................................................. i

INDEX OF AUTHORITIES ..................................................................................... iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................ 1

FEE DISCLOSURE STATEMENT ........................................................................... 1

SUMMARY OF ARGUMENT .................................................................................. 2

ARGUMENT ........................................................................................................... 4

I.   Gag orders like the one at issue here impinge on constitutionally protected newsgathering activities and restrict the flow of accurate, newsworthy information about matters of public interest. .................................................... 4

II.  The Texas Constitution and the First Amendment impose stringent standards that must be satisfied for a gag order to issue in a criminal case. ...................... 5

    A.   The *Davenport* standard is compelled by Article I, Section 8 of the Texas Constitution and applies in both civil and criminal cases. ......................... 5

    B.   The First Amendment requires a finding of "substantial likelihood" of prejudice to the defendant's fair trial rights. ............................................. 9

III. Only in the most extreme cases will pretrial publicity threaten a criminal defendant's ability to receive a fair trial before an impartial jury ................... 11

    A.   This Court has consistently held that extensive news coverage is not inherently prejudicial to a defendant's fair trial rights. ............................ 11

    B.   Federal courts agree that even widespread, adverse publicity does not violate the fair trial rights of criminal defendants. ................................... 14

IV. The gag order at issue is unsupported by findings sufficient to satisfy either the Texas or the federal constitutional standards. .................................................. 19

    A.   The record in this case is devoid of any specific findings to support a substantial likelihood—let alone a serious and imminent threat—of prejudice. ............................................................................................... 20

V.  The Court of Appeals' grant of mandamus was correct on other constitutional grounds. ............................................................................................................ 24

    A.    The gag order is unconstitutionally overbroad and vague........................25

    B.    The trial court improperly rejected alternatives to its expansive prior restraint on speech. ..................................................................................27

CONCLUSION.................................................................................................28

CERTIFICATE OF COMPLIANCE WITH RULE 9.4(i)(3)...............................30

APPENDIX A ..................................................................................................... 1

APPENDIX B ..................................................................................................... 9

# INDEX OF AUTHORITIES

**Cases**

*Bell v. State*, 938 S.W.2d 35 (Tex. Crim. App. 1996) ................................ 11, 12, 20

*Bowen v. Carnes*, 343 S.W.3d 805 (Tex. Crim. App. 2011) ................................ 24

*Calley v. Calloway*, 519 F.2d 184 (5th Cir. 1975),
   *cert. denied* 425 U.S. 911 (1976) ..................................................... 15, 16, 17, 21

*Casey v. Moore,* 386 F.3d 896 (9th Cir. 2004) ................................................. 15

*CBS Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975) ......................................... 4, 9

*Dallas Morning News Co. v. Garcia*, 822 S.W.2d 675
   (Tex. App.—San Antonio 1991, no writ) ........................................................ 4

*Davenport v. Garcia*, 834 S.W.2d 4 (Tex. 1992) (orig. proceeding) ............... passim

*Ex parte McCormick*, 88 S.W.2d 104 (Tex. Crim. App. 1935) ................................ 7

*Ex parte Tucker*, 220 S.W. 75 (Tex. 1920). ....................................................... 6

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) ................................. 9

*Gonzalez v. State*, 222 S.W.3d 446 (Tex. Crim. App. 2007) ................................. 13

*Henley v. State*, 576 S.W.2d 66 (Tex. Crim. App. 1978) ..................................... 13

*Houston Chronicle Pub. Co. v. Shaver*, 630 S.W.2d 927
   (Tex. Crim. App. 1982) .............................................................................. 5, 8

*In re Benton*, 238 S.W.3d 587
   (Tex. App.—Houston [14th Dist.] 2007, no pet.) ........................................ passim

*In re Charlotte Observer*, 882 F.2d 850 (4th Cir. 1989) ................................ 10, 27

*In re Graves,* 217 S.W.3d 744 (Tex. App.—Waco 2007, no pet.) ................... passim

*In re Houston Chron. Publ'g Co.*, 64 S.W.3d 103
   (Tex. App.—Houston [14th Dist.] 2001, no pet.) ........................................ 8, 23

*Journal Publ'g Co. v. Mechem*, 801 F.2d 1233 (10th Cir. 1986) ....................... 9

*Levine v. U.S. Dist. Court*, 764 F.2d 590 (9th Cir. 1985) ..........................................5

*Murphy v. Florida*, 421 U.S. 794 (1975) ...................................................14

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) .............................21

*Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Texas, Inc.*,
975 S.W.2d 546, 559 (Tex. 1998) ...........................................................6

*Patton v. Yount*, 467 U.S. 1025 (1984) ...........................................10, 17

*Reynolds v. United States*, 98 U.S. 145 (1878) .....................................13

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ...........................................18

*Rubenstein v. State*, 407 S.W.2d 793 (Tex. Crim. App. 1966) ..............13

*San Antonio Express-News v. Roman*, 861 S.W.2d 265
(Tex. App.—San Antonio 1993, no writ) ................................................8

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ......................................4, 18

*Skilling v. United States*, 561 U.S. 358 (2010) ..................14, 15, 17, 21

*Teague v. State*, 864 S.W.2d 505, 509 (Tex. Crim. App. 1993) .............11

*United States v. Brown*, 218 F.3d 415 (5th Cir. 2000)...........................9, 10

*United States v. Ford*, 830 F.2d 596 (6th Cir. 1987) .................10, 21, 25

*United States v. Lipscomb*, 299 F.3d 303 (5th Cir. 2002)...........................14

*United States v. Mitchell*, 551 F.2d 1252 (D.C. Cir. 1976) .....................15

*United States v. Scarfo*, 263 F.3d 80 (3d Cir. 2001)................................9

*United States v. Wecht*, 484 F.3d 194 (3d Cir. 2007) .............................9

*United States v. Wilcox*, 631 F.3d 740 (5th Cir. 2011) ...........................15

**Other Authorities**

Dane Schiller, *Waco Twin Peaks says it's working with police after
biker brawl*, Houston Chron. (May 20, 2015, 8:48 A.M.), *archived at*
http://perma.cc/J5Q4-ETNW ...................................................................16

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici* file this brief in opposition to Relator's Application for a Writ of Mandamus. As representatives and members of the media, *amici* have a strong interest in preserving their ability to gather news and report on ongoing criminal proceedings, and in ensuring that any prior restraint on speech imposed by a court meets constitutional requirements.

The impact of this Court's resolution of Relator's Application extends beyond this case. Accordingly, *amici* submit this brief to emphasize the constitutional interests at stake and the impact that gag orders like the one entered by the trial court have on all members of the media. A supplemental statement of identity and interest of *amici curiae* is included below as Appendix A.

## FEE DISCLOSURE STATEMENT

Pursuant to Rule 11(c) of the Texas Rules of Appellate Procedure, *amici* state that no fee was paid or will be paid for the preparing of this brief.

## SUMMARY OF ARGUMENT

The gag order imposed by the trial court in this case has placed unconstitutional restrictions on speech and prevented members of the media from gathering the news and reporting on matters of significant public interest. The trial court failed to apply the correct legal standards for determining whether and to what extent the constitutional rights of the press and the public under the First and Fourteenth Amendments to the U.S. Constitution and Article I, Section 8 of the Texas Constitution must yield to preserve a defendant's ability to receive a fair trial by an impartial jury. The Tenth Court of Appeals, below, was thus correct in conditionally granting mandamus relief and ordering the trial court to vacate its gag order. *See In re Clendennen*, No. 10-15-00235-CR (Tex. App.—Waco August 7, 2015) (not designated for publication). This Court should uphold that ruling.

The standard set forth in *Davenport v. Garcia*, 834 S.W.2d 4 (Tex. 1992) (orig. proceeding) is the correct standard for evaluating the constitutionality of a prior restraint like the one at issue here under Texas law. The gag order entered by the trial court in this case not only fails to satisfy that heightened standard, it also fails to satisfy the standard compelled by the U.S. Constitution. The record in this case does not include *any* findings of inflammatory or prejudicial media coverage supporting a determination that Matthew Allen Clendennen's ("Clendennen") fair trial rights would be threatened in any way by public access to information about

2

his case—let alone findings of prejudice to the extent required to justify curtailing the exercise of state and federal constitutional rights. For that reason alone, the Court of Appeals' ruling was correct.

In addition, the gag order is unconstitutionally vague and overbroad. Not only does it purport to restrain the speech of too many individuals, including witnesses and law enforcement officers who do not possess information that could jeopardize Clendennen's fair trial rights, but the order also restricts too much speech and is of unlimited duration. The order prevents any gagged individual from making any statement whatsoever to the media, without regard to whether it is innocuous, purely factual, or already a matter of public record. The trial court made no attempt to narrowly tailor the gag order to prevent dissemination only of prejudicial material, or even to limit the order's duration. It is unclear from the language of the gag order what speech—if any—concerning Clendennen's case or the underlying incident falls safely outside its ambit.

Finally, the trial court failed to give proper consideration to alternatives designed to safeguard the integrity and impartiality of a jury, including *voir dire,* which is normally sufficient to root out prejudice, even in the most high-profile and publicized of criminal trials.

For these reasons, *amici* urge this Court to deny Relator's Application for a Writ of Mandamus.

3

## ARGUMENT

**I. Gag orders like the one at issue here impinge on constitutionally protected newsgathering activities and restrict the flow of accurate, newsworthy information about matters of public interest.**

Media access to criminal proceedings, court records, and trial participants is essential to the public's understanding and oversight of the judicial system. For centuries, the press has played a critical role in facilitating public oversight of the courts. "A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field." *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

> The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. . . . And where there was no threat or menace to the integrity of the trial, we have consistently required that the press have a free hand, even though we sometimes deplored its sensationalism.

*Id.* (citations omitted) (internal quotation marks omitted).

Both the Texas Constitution and U.S. Constitution protect newsgathering activities, including the right of a reporter to receive information from a willing speaker. *See Dallas Morning News Co. v. Garcia*, 822 S.W.2d 675, 678 (Tex. App.—San Antonio 1991, no writ) (emphasizing that "news gathering" activities are protected by both the state and federal constitutions); *CBS Inc. v. Young*, 522 F.2d 234, 237–38 (6th Cir. 1975) (gag order "directly impaired or curtailed" the media's "constitutionally guaranteed right" to gather the news); *Levine v. U.S.*

4

*Dist. Court*, 764 F.2d 590, 594 (9th Cir. 1985) ("By effectively denying the media access to litigants, the district court's order raises an issue under the first amendment by impairing the media's ability to gather news.") (citation omitted).

Gag orders curtail the exercise of that right, and restrict the flow of accurate, newsworthy information to the public about matters of public interest. They prevent the media and, by extension, the public, from obtaining information about a case from the most knowledgeable individuals, verifying information obtained elsewhere, and clarifying or contextualizing arguments asserted in court documents or proceedings. The effect of such orders is to reduce both the quantity and quality of information flowing to the public about matters vital to self-governance, such as the administration of justice, public safety, and law enforcement activities.

## II. The Texas Constitution and the First Amendment impose stringent standards that must be satisfied for a gag order to issue in a criminal case.

### A. The *Davenport* standard is compelled by Article I, Section 8 of the Texas Constitution and applies in both civil and criminal cases.

Article I, Section 8 of the Texas Constitution states that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege…." *See also Houston Chron. Publ'g Co. v. Shaver*, 630 S.W.2d 927, 928 (Tex. Crim. App. 1982) ("The central idea embodied in the Constitution is simple: Express what one will, understanding one may be called to account for abusing the privilege."). Courts in this state have long

5

recognized that "[p]unishment for the abuse of the right [to free speech], *not prevention of its exercise*, is what [this] provision contemplates." *Ex parte Tucker*, 220 S.W. 75, 76 (Tex. 1920) (emphasis added). Thus, as "the text, history, and purpose of the provision" make clear, Article I, Section 8 provides heightened protection against prior restraints on speech that exceed even the stringent protections afforded by the First Amendment. *Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Texas, Inc.*, 975 S.W.2d 546, 559 (Tex. 1998).

Because the Texas Constitution provides "greater rights of free expression than its federal equivalent," *Davenport*, 834 S.W.2d at 10, the Texas Supreme Court has applied a particularly exacting standard to evaluate gag orders, holding that such orders:

> will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm.

*Id.*; *see also id.* at 36 (stating that federal First Amendment standards are insufficiently protective of "the rights of free expression that we believe that the fundamental law of our state secures").

The constitutional standard announced in *Davenport* is applicable in criminal cases as well as civil disputes. By requiring the risk of prejudice to a criminal defendant to be "imminent and irreparable" to justify a gag order, the

6

*Davenport* standard correctly reflects the Texas Constitution's animosity toward prior restraints, and its recognition that in all but the most extreme cases any risk of prejudice from pretrial publicity may be cured by less drastic remedial measures. *See Davenport*, 834 S.W.2d at 10–11 (placing more faith in remedial measures than federal case law); *see also Benton*, 238 S.W.3d at 600 ("[I]t is only the occasional case that presents a danger of prejudice from pretrial publicity.").

Application of the *Davenport* standard in the criminal context is also consistent with this Court's precedent, as well as the decisions of lower appellate courts. Over a century ago, this Court recognized that prior restraints conflict with "the genius and spirit of our free institutions, which is intended to guaranty publicity to the proceedings of our courts, and the greatest freedom in the discussion of the doings of such tribunals, consistent with truth and decency." *Ex parte Foster*, 71 S.W. 593, 595 (Tex. Crim. App. 1903). Because prior restraints are particularly disfavored as a matter of Texas constitutional law, this Court has rejected attempts to prevent publication of testimony adduced in criminal trials. *See id*. at 595 (holding a prior restraint on publication of testimony unconstitutional); *Ex parte McCormick*, 88 S.W.2d 104, 106 (Tex. Crim. App. 1935) (holding a prior restraint on publication of testimony unconstitutional). Similarly, this Court has recognized that prior restraints that deny the press and the public access to information about criminal proceedings are almost always

7

unnecessary because "in our adversary system of criminal justice the ultimate safeguard against prejudicial publicity is the right of the accused to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly." *Shaver*, 630 S.W.2d at 933 (internal citation marks omitted).

Recognizing that the *Davenport* standard strikes the correct constitutional balance, and is sufficiently protective of criminal defendants' fair trial rights, the Tenth and Fourth Courts of Appeals have expressly held that it applies in criminal cases. *See In re Graves*, 217 S.W.3d 744, 749 (Tex. App.—Waco 2007, no pet.); *see also San Antonio Express-News v. Roman*, 861 S.W.2d 265, 268 (Tex. App.—San Antonio 1993, no writ). As the Court of Appeals in *San Antonio Express-News* explained, "[t]he application of *Davenport* to a criminal proceeding is appropriate as a means of protecting the public's right of access to criminal trials and proceedings and free speech through the dissemination of public information—especially when, as in this case, the criminal defendant has raised no challenge that without the gag order he will be deprived of a fair trial." 861 S.W.2d. at 268 (citations omitted).[1]

---

[1] While other Courts of Appeals have failed to apply the *Davenport* standard in criminal cases, they have either declined to reach the question of its application, or not articulated any rationale for rejecting it. *See In re Benton*, 238 S.W.3d 587, 597 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("We need not determine whether the higher *Davenport* standard applies in this criminal

**B. The First Amendment requires a finding of "substantial likelihood" of prejudice to the defendant's fair trial rights.**

Gag orders are also presumptively invalid under the U.S. Constitution. *Young*, 522 F.2d at 238; *see also Journal Publ'g Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986) (stating that "any inhibitions against news coverage of a trial carry a heavy presumption of an unconstitutional prior restraint"). A gag order that restricts the speech of lawyers and parties may issue only when a court makes specific findings showing that extrajudicial commentary by those individuals presents a "substantial likelihood of material prejudice" to the court's ability to conduct a fair trial, and the order must be narrowly tailored and the least restrictive means available to preserve the fairness of the trial. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1063 (1991); *United States v. Brown*, 218 F.3d 415, 427–28 (5th Cir. 2000).[2] Speech restrictions must be no greater than essential to

---

case, because the record and the findings do not support the imposition of a gag order even under the lower standards articulated in *Gentile* [*v. State Bar of Nevada*, 501 U.S. 1030 (1991)] and *Brown*."); *In re Houston Chron. Publ'g Co.*, 64 S.W.3d 103 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (upholding a gag order without explaining the legal basis for the decision).

[2] Federal courts have applied "varying standards to review gag orders depending on whom or what is being gagged." *United States v. Scarfo*, 263 F.3d 80, 92 (3d Cir. 2001). For example, reasoning that tighter restrictions on the speech of lawyers—as opposed to witnesses and potential trial participants—may be permissible "[b]ecause lawyers have special access to information through discovery and client communication" and, thus, their extrajudicial statements may pose a greater threat of prejudice, *Gentile*, 501 U.S. at 1074, some federal courts have concluded that restrictions on lawyers' speech must present a "reasonable likelihood" of material prejudice to the fairness of the proceedings to pass constitutional muster. The majority of jurisdictions require a higher showing for such gag orders. *See United States v. Wecht*, 484 F.3d 194, 205–06 (3d Cir. 2007) ("every state, as well as a majority of federal district courts, now apply rules that are more protective of speech than the reasonable likelihood standard"). In

prevent the specific harm identified. *See Brown*, 218 F.3d at 427–28; *United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987). Because large quantities of speech about a given case carry no risk of prejudicial effect, gag orders that impose a blanket "no comment" rule, without exceptions, are unlikely to satisfy constitutional mandates. *See id.* (concluding that a "no comment" gag order was not narrowly tailored).

For a gag order to be constitutional, it also must be the least restrictive means of preserving the defendant's rights. The power of *voir dire* and other curative measures to negate the effect of any prejudicial publicity should not be understated. *See Patton v. Yount*, 467 U.S. 1025, 1038 (1984) ("It is fair to assume that the method we have relied on since the beginning [*voir dire*], usually identifies bias.") (citation omitted); *In re Charlotte Observer*, 882 F.2d 850, 855–56 (4th Cir. 1989) ("Increasingly the courts are expressing confidence that *voir dire* can serve in almost all cases as a reliable protection against juror bias however induced.").

---

considering the validity of a prior restraint on attorney speech, the Texas Supreme Court has also "assume[d] that the *Gentile* standard is a constitutional *minimum.*" *Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 431 (Tex. 1998) (emphasis added).

10

**III.** **Only in the most extreme cases will pretrial publicity threaten a criminal defendant's ability to receive a fair trial before an impartial jury.**

### A. This Court has consistently held that extensive news coverage is not inherently prejudicial to a defendant's fair trial rights.

Under Texas law, publicity must be "pervasive, prejudicial, and inflammatory" before it is found to pose a risk to a defendant's right to an impartial jury. *Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996) (en banc), *cert. denied*, 516 U.S. 946 (1997) ("The mere fact of media attention and publicity do not, however, automatically establish prejudice."). This Court has repeatedly rejected arguments that pretrial news coverage creates "outside influences affecting the community's climate of opinion as to a defendant are so inherently suspect that the resulting probability of unfairness requires suitable procedural safeguards" to guard against prejudice. *Faulder v. State*, 745 S.W.2d 327, 338 (Tex. Crim. App. 1987).

In *Teague v. State*, for example, a defendant convicted of capital murder argued that the "the trial court should have granted his motion for a change of venue because of the prejudicial pretrial publicity" surrounding his case. 864 S.W.2d 505, 509 (Tex. Crim. App. 1993), *abrogated by Robertson v. State*, 871 S.W.2d 701 (Tex. Crim. App. 1993). Teague introduced evidence showing that several area newspapers and television channels had covered his case. *Id.* at 510. This Court found that Teague was not prejudiced by the trial court's failure to

11

grant his motion for a change of venue despite the fact that several jurors were aware of the case because Teague "did not show the outside influences affecting the community as to him were so inherently suspect as to raise doubt about the likelihood of obtaining a fair and impartial jury." *Id.*

Similarly, in *Bell v. State*, a man who had been convicted multiple times of capital murder charges sought to challenge one conviction on the grounds of improper denial of a motion for change of venue. 938 S.W.2d at 41, 44. He entered 150 newspaper articles and excerpts from nine television news broadcasts into the record, including one broadcast that intimated his guilt, along with testimony from attorneys who opined that he could not receive a fair trial in Jefferson County. *Id.* at 45–46. Thirty-six of the sixty veniremembers, drawn from a qualified jury pool of less than 130,000, had existing knowledge of his case, including six jurors selected for service. *Id.* at 45–46. Nevertheless, this Court held that the defendant's right to an impartial jury was not violated. *Id.* at 46–47. "The mere fact of media attention and publicity do not," the Court reasoned, "automatically establish prejudice or require a change of venue; jurors do not have to be totally ignorant of the facts and issues of a particular case." *Id.* at 46. This Court agreed with the trial court that the news coverage was not sufficiently "inflammatory, pervasive, or prejudicial" to violate defendant's right to an

12

impartial jury, and that jury panel questionnaires sufficiently guarded against prejudicial influence. *Id.*

As this Court has made clear, "even extensive knowledge of the case or defendant in the community as a result of pretrial publicity is not sufficient if there is not also some showing of prejudicial or inflammatory coverage." *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). The extent and nature of pretrial publicity will be found to have risen to that level only in the most extreme circumstances. Indeed, *amici* are aware of only a single case in which this Court has found that a trial court abused its discretion by failing to grant a motion for a change of venue for reasons of pretrial publicity: In 1966, this Court reversed the conviction of Jack Rubenstein, or Jack Ruby, the killer of President John F. Kennedy's assassin, Lee Harvey Oswald, because "the Dallas County climate was one of such strong feeling that it was not humanly possible to give Ruby a fair and impartial trial which is the hallmark of American due process of law." *Rubenstein v. State*, 407 S.W.2d 793, 796 (Tex. Crim. App. 1966) (McDonald, J., concurring).[3]

---

[3] In *Henley v. State*, 576 S.W.2d 66 (Tex. Crim. App. 1978), this Court held that the trial court abused its discretion by failing to hold a hearing on the issue of pretrial publicity. That issue is not presented here.

**B. Federal courts agree that even widespread, adverse publicity does not violate the fair trial rights of criminal defendants.**

The U.S. Supreme Court has likewise made clear that the criminal justice system both anticipates and tolerates jurors who have been exposed to pretrial publicity as an inevitable consequence of an informed citizenry. *See Reynolds v. United States*, 98 U.S. 145, 155–56 (1878) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."); *Murphy v. Florida*, 421 U.S. 794, 800 n.4 (1975) ("We must distinguish between mere familiarity with petitioner or his past and an actual predisposition against him, just as we have in the past distinguished largely factual publicity from that which is invidious or inflammatory.").

Thus, to satisfy the Sixth Amendment's requirement of an impartial jury, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence in court." *Murphy*, 421 U.S. at 800 (internal quotation marks omitted). Under the federal constitution, for pretrial publicity to reach the point of interfering with a defendant's fair trial rights, the publicity must be so inflammatory that any juror exposed to it could not be expected to render an impartial verdict. *See Skilling v. United States*, 561 U.S. 358, 382–83 (2010) (discussing that publicity must be "the kind of vivid, unforgettable information"

14

that is "particularly likely to produce prejudice"); *United States v. Lipscomb*, 299 F.3d 303, 344 (5th Cir. 2002) (stating that the fair trial right "is violated only if . . . the trial atmosphere [is] utterly corrupted by press coverage") (internal quotation marks omitted).

To determine whether the nature of pretrial publicity has risen to this level, district courts must consider the circumstances of each case, including, for example: (1) the time elapsed between the coverage and the trial[4]; (2) whether the coverage contains "confessions or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"[5]; and (3) whether the coverage invites prejudgment of, or expresses opinions about, a *particular defendant's* guilt.[6]

In many high-profile criminal cases—including those involving the Watergate defendants, the platoon leader in the My Lai massacre in Vietnam, and Enron executive Jeffrey Skilling—*voir dire* of prospective jurors sufficiently guarded against prejudice.[7]

---

[4] *Skilling*, 561 U.S. at 383.

[5] *Id.* at 382.

[6] *Id.* at 383 (considering whether the coverage contains reports of a "smoking gun"); *id.* at 384 n.17 ("[W]hen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact.") (internal quotation marks omitted); *see also United States v. Wilcox*, 631 F.3d 740, 747 (5th Cir. 2011) (considering whether publicity "probatively incriminated" the defendant); *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004).

[7] *See United States v. Mitchell*, 551 F.2d 1252, 1262 n.46 (D.C. Cir. 1976) (stating that 10 of the 12 jurors selected "claimed to have followed Watergate casually, if at all"), *rev'd on other*

Perhaps the best example of the principle that remedial measures normally suffice to protect defendants' rights is *Calley v. Callaway*, in which Lieutenant Calley, leader of the platoon responsible for the My Lai massacre in Vietnam, was convicted in a military court. 519 F.2d 184, 190–191 (5th Cir. 1975), *cert. denied* 425 U.S. 911 (1976). The massacre, and Lt. Calley's involvement in it, had received "massive" amounts of "intense" publicity. *Id.* at 205. The record contained "volumes of clippings, reports and extracts from written reports on the case, as well as video tapes" of news coverage. *Id.* at 204. The federal district court that reviewed Lt. Calley's conviction found that he "had been persecuted and pilloried by the news media so intent on making prejudicial revelations about the incident" that it was "not humanly possible for the jurors not to be improperly influenced by" the news coverage, which had "lasting emotional impact." *Id.* at 205. The court concluded "it would be sheer fantasy to believe that the jurors did not see, hear and read (the publicity) or that they were not influenced by it," and held that Lt. Calley's Sixth Amendment right had been violated. *Id.*

The Fifth Circuit reversed, holding that the publicity was not prejudicial, and that Lt. Calley had not been deprived of his right to a fair trial by an impartial jury.

---

*grounds sub nom.*, *Nixon v. Warner Commc'ns*, 435 U.S. 589 (1978); *Calley*, 519 F.2d at 206 ("the exhaustive *voir dire* conducted at trial indicates that there is no likelihood that pretrial publicity prejudiced Lieutenant Calley"); *Skilling*, 561 U.S. at 384 ("the extensive screening questionnaire and follow-up *voir dire* were well suited to that task").

16

Stating that it could not "accept the position that 'prominence brings prejudice,'" the Fifth Circuit closely examined the publicity in the record before it and determined that while some of the coverage contained "virulent and oppressive attacks on Calley," "a good deal of the extensive publicity" contained "objective statements of the facts known and discovered about the My Lai incident." *Id.* at 206. The federal court of appeals distinguished "'straight news stories'" from "'invidious articles which would tend to arouse ill will and vindictiveness,'" and concluded that "there appears to have been no single sentiment regarding the case held by a vast segment of the American public." *Id.* (quoting *Beck v. Washington*, 369 U.S. 541, 556 (1962)).

The Fifth Circuit also found that a "searching and sensitively conducted *voir dire*" eliminated the likelihood that the jurors selected "were other than fair and impartial individuals who would determine Calley's guilt or innocence based solely on the evidence developed before the court." *Id.* at 208–09. As the court explained, "[t]he law does not prohibit the informed citizen from participating in the affairs of justice. In prominent cases of national concern, we cannot allow widespread publicity concerning these matters to paralyze our system of justice." *Id.* at 210.

The Fifth Circuit's approach comports with U.S. Supreme Court precedent. *See Patton*, 467 U.S. at 1025, 1029–30 (holding that pretrial publicity did not

violate the right to an impartial jury, despite the fact that 77 percent of prospective jurors "admitted they would carry an opinion into the jury box" and eight of the fourteen jurors and alternates actually seated "admitted that at some time they had formed an opinion as to Yount's guilt"); *Skilling*, 561 U.S. at 375, 377, 385 (holding that the district court properly denied a motion to change venue, despite "community passion aroused by Enron's collapse and the vitriolic media treatment" of the defendant, which "wrote of Skilling's guilt as a foregone conclusion").

In the small number of cases in which the United States Supreme Court has found such overwhelming prejudice that the defendant was denied his right to receive a fair trial, the inflammatory nature of the media coverage was extreme. *See Rideau v. Louisiana*, 373 U.S. 72, 723–27 (1963) (finding multiple television broadcasts of footage of the defendant "in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff" prejudicial); *Sheppard*, 384 U.S. at 334–36, 358, 363 (declining to hold that months of "virulent" pretrial publicity alone deprived the defendant of a fair trial, even though the media televised a three-day inquest, during which the defendant "was examined for more than five hours without counsel"; vacating the defendant's conviction only after considering factors unrelated to the content of pretrial publicity).

As the foregoing cases illustrate, pretrial publicity must be extraordinary to prejudice a defendant's rights to a fair trial by an impartial jury. And, even in sensational cases, *voir dire* and other remedial measures are sufficient safeguards.

**IV.  The gag order at issue is unsupported by findings sufficient to satisfy either the Texas or the federal constitutional standards.**

This case arises out of a gang-related shootout that resulted in nine deaths, eighteen injuries and more than 170 arrests. *See* Dane Schiller, *Waco Twin Peaks says it's working with police after biker brawl*, Houston Chron. (May 20, 2015, 8:48 A.M.), *archived at* http://perma.cc/J5Q4-ETNW. The incident received both local and national media coverage when it occurred because the shooting raised issues of public safety, law enforcement, and gang violence. The nature of the media coverage was immediately praised by law enforcement. *See* App. 5, Video File B at 11:15 [8] ( "the media assistance that we had here yesterday was very good in getting information out quickly to our public"); App. 5, Video File C at 24:30 ("the media is doing a phenomenal job as well providing information and getting that out"). Indeed, law enforcement described news coverage of the incident as "responsible," and encouraged members of the media to continue to verify facts with police. *See* App. 5, Video File C at 2:44 ("I would ask you to continue

---

[8]  All subsequent references to "App." refer to Clendennen's Appendix for Writ of Mandamus, filed with the Tenth Court of Appeals on July 8, 2015.

19

responsible reporting. If you don't know that it's a fact, please come to me and I will give you that information if I can.").

The only specific reference to Clendennen in the news coverage in the record is an online report by KCEN-TV, which describes Clendennen's efforts to subpoena surveillance footage in connection with this prosecution. App. 3 at Ex. B. That story refers to Clendennen as "a man charged in the May 17th Twin Peaks shootings," and quotes Clendennen's counsel as saying that the police "have repeatedly given the public contradictory information about the events," and that Clendennen wanted the video footage "to show there was no probable cause to arrest" him and to loosen his bond conditions at a hearing on August 10, 2015. *Id.*

On June 30, 2015, the McLennan County District Attorney's Office filed a motion for a gag order approximately ten minutes before the trial court was to hear its motion to quash Clendennen's subpoena for the surveillance footage of the shootout. Pet. at 2. As a result, neither Clendennen nor members of the news media had any meaningful opportunity to oppose the gag order prior to its entry

A. **The record in this case is devoid of any specific findings to support a substantial likelihood—let alone a serious and imminent threat—of prejudice.**

The Court of Appeals was correct that the trial court abused its discretion by issuing the gag order. The trial court's conclusion that prejudice was reasonably likely to result from future news coverage was speculative, conclusory, and

20

unsupported by any specific findings. *See Graves*, 217 S.W.3d at 752 (requiring

the court to make "specific findings supported by evidence"); *Davenport*, 834

S.W.2d. at 10.

The trial court did not identify a single news report that contained *any*

"prejudicial, or inflammatory" coverage—let alone such coverage concerning

Clendennen specifically. *Bell*, 938 S.W.2d at 46. Indeed, the gag order did not

discuss the concept of "prejudice," focusing instead on the *quantity* of coverage.

*See* App'x 4 at 1–2. For example, the court commented on "extensive local and

national media coverage," and expressed concern about the "volume of pre-trial

publicity," the "willingness" of counsel to speak with the media, and the inability

of a delay to "lessen the publicity generated by this case." *Id.* at 2. It offered only

conclusory statements that "publicity will interfere with the defendant's right to a

fair trial" and that the publicity posed a "specific threat to the judicial process." *Id.*

These findings are facially insufficient to support a gag order. The mere fact

that news coverage about a particular event has been prevalent does not support a

conclusion that such coverage is substantially likely to be prejudicial or poses an

imminent threat to a defendant's rights. *See Calley*, 519 F.2d at 206. The proper

inquiry is not whether counsel, the parties, or trial participants exhibit a

"willingness to give interviews to the media," or whether the resulting news

coverage has been "extensive," App'x 4 at 1, but whether the nature and content of

21

the publicity is sufficiently threatening to the ability to seat an impartial jury. Nothing in the record suggests that news coverage of such an inflammatory nature has occurred or will occur in the absence of a gag order. And there is nothing to indicate that the effect of anticipated news coverage would be so irreparably damaging that no alternative remedial measures could "blunt the impact of pretrial publicity." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 565 (1976).[9]

Moreover, the trial court failed to take into account that any prejudicial effect of media coverage diminishes with time. *See Skilling*, 561 U.S. at 383; *Benton*, 238 S.W.3d at 599 (finding "no substantial likelihood of material prejudice when such a substantial period of time elapses [six months] between the statements and the seating of a jury"). When the trial court entered the gag order, Clendennen had not yet been indicted, and any criminal trial—if one is to occur—is likely many months away. Even if the trial court had jurisdiction to enter the gag order before indictment, which Clendennen contests, the order contains no findings based on any evidence that the impact of future news coverage is substantially likely to prejudice potential jurors *at the time of trial*, or that jurors would be unable to reach a verdict based solely on the evidence presented in court.

---

[9] The fact that Clendennen is himself challenging the gag order issued by the trial court should alone counsel against any finding of prejudice. Under the federal constitution, the Sixth Amendment guarantees a fair trial to the individual defendant, and thus it is the defendant who is best positioned to advocate for his own rights. *See Ford*, 830 F.2d at 600.

The gag order at issue here resembles those which were found lacking in *Graves* and *Benton*. In *Graves*, the trial court's order noted that pretrial publicity included "local and national newspaper coverage" and stated that "it is necessary to enter this Restrictive Order to protect and provide for a fair and impartial trial in this cause of action." *Graves*, 217 S.W.3d at 743. And, in *Benton*, the trial court determined that the case had "generated extensive media coverage and publicity," and noted that it had previously "admonished trial counsel to try the case in court and not in the media." *Benton*, 238 S.W.3d at 590–91. The trial court also took note of the fact that the defendant and his counsel exhibited an "extraordinary willingness to grant interviews to the media," and that the parties had discussed the terms of plea-bargain negotiations in detail with the media. *Id.* at 591.

In both cases, these findings were insufficient. In *Graves*, the court of appeals rejected the trial court's conclusory findings, pointed to a lack of evidentiary support for the determination that a gag order was necessary to protect a fair trial, and criticized the trial court for not "detailing the nature or extent of the pretrial publicity . . . or how the pretrial publicity . . . will impact the right to a fair and impartial jury." *Graves*, 217 S.W.3d at 752–73. Similarly, in *Benton*, the court of appeals identified only one finding that "potentially . . . may have caused or could cause prejudice"—the disclosure of details of the plea-bargain negotiations—and determined that it, alone, was insufficient. *Benton*, 238 S.W.3d

23

at 597–98. The appellate court faulted the trial court for focusing on the "quantity" of coverage over its "content or even its effects," *id.* at 598, and found no issues with news coverage that contained "defense counsels' assertions of innocence based on self-defense, reports of trial proceedings, and reasonable inferences from witness testimony," *id.* at 600. Both gag orders, accordingly, were set aside.[10]

The same result is required here. Under either the First Amendment or the Texas Constitution, the Court of Appeals was correct in its conclusion that the trial court's unsupported findings are patently insufficient to sustain the gag order.

## V. The Court of Appeals' grant of mandamus was correct on other constitutional grounds.

Under Texas law, mandamus will lie when a relator can show that "he has no adequate remedy at law to redress his alleged harm" and when "what he seeks to compel is a ministerial act, not involving a discretionary or judicial decision." *Bowen v. Carnes*, 343 S.W.3d 805, 810 (Tex. Crim. App. 2011) (quoting *State ex rel. Young v. Sixth Judicial Dist. Court of Appeals at Texarkana*, 236 S.W.3d 207,

---

[10] The gag order in this case is similar to one upheld in *In re Houston Chronicle Publishing Co.*, 64 S.W.3d at 108. In that case, however, the Fourteenth Court of Appeals did not discuss—or even identify—the legal standard it applied, and thus its decision lacks persuasive value. In any event, that case is distinguishable in at least two key respects. First, in *Houston Chronicle*, no individual subject to the gag order challenged its validity. Second, the defendant in that case, Andrea Yates, had already been indicted and the parties warned about prejudicial publicity before the court entered a gag order, after circulating a proposed order and seeking requests for modifications. *Id.* at 105. Here, Clendennen had not yet been indicted when the order was entered, the trial court gave no notice that a gag order might be imposed, and neither Clendennen nor the media had an opportunity to challenge the gag order prior to its entry.

210 (Tex. Crim. App. 2007)).  Not only was the Court of Appeals' grant of mandamus warranted because the trial court's lack of findings, under any standard, violated "unequivocal, well-settled . . . and clearly controlling legal principles," *id.*, it was also warranted because the gag order is unconstitutionally overbroad, vague, and not narrowly tailored to achieve a compelling interest.

### A. The gag order is unconstitutionally overbroad and vague.

The gag order is overbroad, and therefore not narrowly tailored, for at least three reasons.  ***First***, the order restricts innocuous speech that poses no risk of prejudice to Clendennen.  The gag order creates a sweeping "no comment" rule, ordering that "[a]ll attorneys, their staffs, and law enforcement officers involved in the case *shall not discuss this case* with the media."  App. 4 at 2 (emphasis added). The order similarly directs witnesses "not [to] discuss this case with the media." *Id.*  These provisions make no exception for willing speakers to discuss factual matters already in the public domain or to correct misunderstandings, rumors or inaccuracies being disseminated about the case.  The gag order does not even permit Clendennen or his counsel to inform the media about logistical matters, such as the date, time and location of upcoming hearings.  Because the gag order restricts speech that does not carry a sufficient risk of prejudice, the gag order is unconstitutional.  *See Graves*, 217 S.W.3d at 748 (requiring the gag order to be "the least restrictive means to prevent" an imminent and irreparable harm); *Ford*,

25

830 F.2d at 599 (discussing "no comment" gag orders and stating that "such broadly based restrictions on speech in connection with litigation are seldom, if ever, justified," particularly in criminal cases).

*Second*, the gag order is overbroad because it extends to all law enforcement, witnesses, or counsel's staff without adequate justification. The trial court's conclusory findings about the necessity of the gag order relate only to counsel. *See, e.g.,* App. 4 at 1 ("*counsels'* willingness to give interviews . . . would only serve to increase the volume of pre-trial publicity") (emphasis added); *id.* at 2 ("if *counsel for the parties* continue to grant interviews to the media, the pre-trial publicity will interfere with the defendant's right[s]") (emphasis added); *id.* ("an order restricting extra-judicial commentary *by counsel for the parties* is necessary to preserve all venue options") (emphasis added). The trial court made no findings, whatsoever, and offered no explanation for the restrictions it placed on statements by law enforcement, witnesses, or counsel's staff.

*Third*, the gag order is overbroad because its duration is unlimited. Notwithstanding its stated purpose to preserve the ability to seat an impartial jury, App. 4 at 2, the gag order is not addressed to that concern. The order's restrictions on speech will remain in place long after a jury is seated and long after the jury returns its verdict—assuming this matter ever reaches trial. For all of these reasons, the gag order is unconstitutionally overbroad.

26

The order also is unconstitutionally vague. The order does not make clear whether the speech restrictions apply to any discussion of the underlying incident generally, including the other pending criminal cases, or to Clendennen's civil lawsuit. And to the extent the order permits some nonprejudicial speech about the case or the underlying incident, it is unclear what speech is permissible. The gag order should be vacated on vagueness grounds as well.

**B. The trial court improperly rejected alternatives to its expansive prior restraint on speech.**

In rejecting remedial alternatives, the trial court improperly focused on the *volume* of publicity, asserting that less restrictive measures, such as delaying trial, "would not lessen the publicity generated by this case." App'x 4 at 2. Instead, the trial court should have inquired whether remedial measures are incapable of curing any unfair *prejudice* from pretrial publicity. *See Benton*, 238 S.W.3d at 598.

Moreover, the trial court failed to explain why *voir dire* would be incapable of rooting out any incurable prejudice, as it has done in so many high-profile cases. Indeed, in "almost all cases," *voir dire* will provide adequate protection "against juror bias however induced." *Charlotte Observer*, 882 F.2d at 856. The Texas Code of Criminal Procedure specifically anticipates juror challenges based on conclusions "formed from reading newspaper accounts, communications, statements or reports or mere rumor or hearsay." Tex. Code Crim. Proc. § art. 35.16(a)(10) (2006). The trial court's discussion of alternatives to the gag order is

27

insufficient to sustain a prior restraint under the First Amendment or the Texas Constitution. [11] *See id.; Davenport*, 834 S.W.2d at 11 (requiring trial courts to explain "why such harm could not be sufficiently cured by remedial action").

Simply because a criminal case generates media coverage, even extensive media coverage, does not mean that every potential juror will have been exposed to it. Nor does it mean that every potential juror will have formed inalterable opinions as to the defendant's guilt or innocence and be incapable of making a decision based solely on the evidence presented at trial. Here, the record contains no basis for concluding that *voir dire* or other corrective measures are incapable of protecting Clendennen's fair trial rights, and the gag order should be set aside.

## CONCLUSION

For all the foregoing reasons, *amici curiae* respectfully urge this Court to deny Relator's Application for a Writ of Mandamus and uphold the ruling of the Tenth Court of Appeals.

Respectfully submitted,

/s/ Hannah Bloch-Wehba

---

[11] Prior restraints on speech, like sealed court documents and closed courtrooms, will almost always be effective at restricting the free flow of information about a trial. However, the district court must consider whether *alternatives* to these extraordinary measures are insufficient to preserve the defendant's rights, not whether drastic measures are effective. *See Graves*, 217 S.W.3d at 748 (requiring judicial action to be "the least restrictive means to prevent that harm"); *see also Davenport*, 834 S.W.2d at 11 ("'the argument of convenience can have no weight as against those safeguards of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen.'")

28

Hannah Bloch-Wehba, Esq.
    *Counsel of Record*
Bruce D. Brown, Esq.
Katie Townsend, Esq.
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS

\* Additional counsel for *amici* are listed
  below in Appendix B

Dated:      September 14, 2015
            Washington, D.C.

29

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4(i)(3)

This brief complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i)(3) because this brief contains 7,178 words, excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Hannah Bloch-Wehba
Hannah Bloch-Wehba
  *Counsel of Record for Amici Curiae*
REPORTERS COMMITTEE FOR FREEDOM
  OF THE PRESS

Dated:      September 14, 2015
            Washington, D.C.

## SUPPLEMENTAL STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*

**The Reporters Committee for Freedom of the Press** is a voluntary, unincorporated association of reporters and editors working to defend and preserve First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance, and research in First Amendment and Freedom of Information Act litigation since 1970, and it frequently files friend-of-the-court briefs in significant media law cases.

With some 500 members, **American Society of News Editors** ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

**The Associated Press** ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York, and owned by its 1,500 U.S. newspaper members. The AP's members and subscribers include the nation's

newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 300 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

**Association of Alternative Newsmedia** ("AAN") is a not-for-profit trade association for 130 alternative newspapers in North America, including weekly papers like The Village Voice and Washington City Paper. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

**Courthouse News Service** is a California-based legal news service for lawyers and the news media that focuses on court coverage throughout the nation, reporting on matters raised in trial courts and courts of appeal up to and including the U.S. Supreme Court.

**Cox Media Group, Inc.** is an integrated broadcasting, publishing, direct marketing and digital media company. Its operations include 15 broadcast television stations, a local cable channel, a leading direct marketing company, 85 radio stations, eight daily newspapers and more than a dozen non-daily print publications and more than 100 digital services.

**First Amendment Coalition** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order

to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

**First Look Media, Inc.** is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

**Gannett Co., Inc.** is an international news and information company that publishes 93 daily newspapers in the United States, including The El Paso Times and USA TODAY. Each weekday, Gannett's newspapers are distributed to an audience of 9 million readers and the websites associated with the company's publications serve online content to 95 million unique visitors each month.

**Hearst Corporation** is one of the nation's largest diversified media and information companies. Its major interests include ownership of 15 daily and more than 30 weekly newspapers, including the Houston Chronicle, San Antonio Express-News, San Francisco Chronicle and Albany Times Union; hundreds of magazines around the world, including Good Housekeeping, Cosmopolitan, ELLE and O, The Oprah Magazine; 31 television stations, which reach a combined 18 percent of U.S. viewers; ownership in leading cable networks, including Lifetime, A&E, HISTORY and ESPN; significant holdings in automotive, electronic and

medical/pharmaceutical business information companies; a majority stake in global ratings agency Fitch Group; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

The **Investigative Reporting Workshop**, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

**MPA – The Association of Magazine Media**, ("MPA") is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover politics, religion, sports, industry, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

The **National Association of Black Journalists** (NABJ) is an organization of journalists, students and media-related professionals that provides quality programs and services to and advocates on behalf of black journalists worldwide.

Founded by 44 men and women on December 12, 1975 in Washington, D.C., NABJ is the largest organization of journalists of color in the nation.

**National Newspaper Association** is a 2,400 member organization of community newspapers founded in 1885.  Its members include weekly and small daily newspapers across the United States.  It is based in Columbia, Missouri.

**The National Press Club** is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations.  The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The **National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry.  Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**The New York Times Company** is the publisher of The New York Times and The International Times, and operates the news website nytimes.com.

**The News Guild – CWA** is a labor organization representing more than 30,000 employees of newspapers, newsmagazines, news services and related media enterprises. Guild representation comprises, in the main, the advertising, business, circulation, editorial, maintenance and related departments of these media outlets. The News Guild is a sector of the Communications Workers of America. CWA is America's largest communications and m

**Newspaper Association of America** ("NAA") is a nonprofit organization representing the interests of more than 2,000 newspapers in the United States and Canada. NAA members account for nearly 90% of the daily newspaper circulation in the United States and a wide range of non-daily newspapers.  The Association focuses on the major issues that affect today's newspaper industry, including protecting the ability of the media to provide the public with news and information on matters of public concern.

**Online News Association** ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital

delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**The Star-Telegram** is a daily newspaper in Forth Worth, Texas that delivers national and local news through its print edition and online at

http://www.star-telegram.com. The Star-Telegram is owned by Star-Telegram, Inc., a wholly-owned subsidiary of The McClatchy Company. The McClatchy Company, publicly traded on the New York Stock Exchange under the ticker symbol MNI, operates media companies in 28 U.S. markets in 14 states. Contrarius Investment Management Limited owns 10% or more of the common stock of The McClatchy Company.

The **Texas Press Association** is an industry association representing nearly 450 daily and weekly newspapers across the state of Texas, each of which upholds a strong tradition of journalistic integrity and community service. Texas Press, founded in 1880, performs numerous services on behalf of its members, including sponsoring and promoting legislation and taking legal action to protect the First Amendment and open government.

The **Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

# APPENDIX B

## ADDITIONAL COUNSEL FOR *AMICI CURIAE*

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News
Editors* and *Association of Alternative
Newsmedia*

Karen Kaiser
General Counsel
The Associated Press
450 W. 33rd Street
New York, NY 10001

Rachel Matteo-Boehm
Bryan Cave LLP
560 Mission Street, Suite 2500
San Francisco, CA 94105
*Counsel for Courthouse News Service*

Lance Lovell
Managing Attorney, Disputes
Cox Media Group, Inc.
6205 Peachtree Dunwoody Road
Atlanta, GA 30328

Peter Scheer
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

Lynn Oberlander
General Counsel, Media Operations
First Look Media, Inc.
162 Fifth Avenue
8th Floor
New York, New York 10010
(347) 453-8111

Barbara W. Wall
Senior Vice President & Chief Legal
Officer
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
(703) 854-6951

Jonathan Donnellan
Kristina Findikyan
Hearst Corporation
Office of General Counsel
300 W. 57th St., 40th Floor
New York, NY 10019

James Cregan
Executive Vice President
MPA – The Association of Magazine Media
1211 Connecticut Ave. NW Suite 610
Washington, DC 20036

Kurt Wimmer
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
*Counsel for the Newspaper Association
of America*

A-9

Tonda F. Rush
CNLC, LLC
200 Little Falls Street, Suite 405
Falls Church, VA 22046
(703) 237-9801 (p)
(703) 237-9808 (fax)
tonda@nna.org
*Counsel to National Newspaper*
*Association*

Charles D. Tobin
Holland & Knight LLP
800 17th Street, NW
Suite 1100
Washington, DC 20006
*Counsel for The National Press Club*

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press*
*Photographers Association*

David McCraw
V.P./Assistant General Counsel
The New York Times Company
620 Eighth Avenue
New York, NY 10018

Barbara L. Camens
Barr & Camens
1025 Connecticut Ave., NW
Suite 712
Washington, DC 20036
*Counsel for The Newspaper Guild –*
*CWA*

Laura R. Handman
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006

Thomas R. Burke
Davis Wright Tremaine LLP
Suite 800
500 Montgomery Street
San Francisco, CA 94111
*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital*
*News Association*

Bruce W. Sanford
James Romoser
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional*
*Journalists*

Juan Cornejo
The McClatchy Company
2100 Q Street
Sacramento, CA 95816
*Counsel for The Star-Telegram*

# CERTIFICATE OF SERVICE

I, Hannah Bloch-Wehba, certify that, on this 14th day of September, 2015, I caused copies of the foregoing Brief of Amici Curiae to be served electronically, via eFile Texas or email, on:

McLennan County District Attorney
219 N. 6th Street
Waco, Texas 76701
    *Counsel for State of Texas, Relator*

F. Clinton Broden
Broden, Mickelsen, Helms & Snipes, LLP
2600 State Street
Dallas, Texas 75204
    *Counsel for Matthew Alan Clendennen, Real Party in Interest*

Honorable Matt Johnson
54th District Court
501 Washington Ave., Suite 305
Waco, Texas 76701
    *Real Party in Interest*

Tenth Court of Appeals
501 Washington Ave.
Waco, Texas 76701
    *Respondent*

/s/ Hannah Bloch-Wehba
Hannah Bloch-Wehba
    *Counsel of Record for Amici Curiae*
REPORTERS COMMITTEE FOR FREEDOM
    OF THE PRESS